UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

ROBERT H. YOE, III, *et al.*,                    )
                                                 )
               Plaintiffs,                       )          Case No. 1:15-cv-3-SKL
                                                 )
v.                                               )
                                                 )
CRESCENT SOCK COMPANY, *et al.*,                 )
                                                 )
               Defendants.                       )


## MEMORANDUM AND ORDER

Before the Court is Crescent's[1] motion for sanctions pursuant to Federal Rule of Civil

Procedure 37(e) for alleged spoliation of electronically stored information ("ESI") [Doc. 288],

with supporting brief and exhibits [Doc. 289]. YEI filed a response in opposition with exhibits

[Doc. 341]. Crescent filed a reply with exhibits [Doc. 346]. This matter is now ripe.

### I.      BACKGROUND

The parties' multifaceted dispute has a long and fiercely litigated procedural history and

the discovery phase of the federal court case has been especially challenging. The parties

engaged in extensive and, at many times, contentious discovery and motion practices concerning,

among other things, Plaintiffs access to ESI concerning YEI's intellectual property allegedly in

the exclusive possession of Crescent. Crescent now requests that the Court impose a severe form

---

[1] The Court understands Defendant Crescent Sock Company ("Crescent") brought the motion on
behalf of all Defendants and Plaintiff Yoe Enterprises, Inc. ("YEI") has responded to the motion
on behalf of itself and Plaintiff Robert H. Yoe, III ("Yoe").

of sanctions on YEI for YEI's spoliation of certain ESI—the exact nature of which is unknown due to its destruction.

Many significant facts concerning the spoliation motion are not in dispute, but the content of the data destroyed is hotly disputed. On September 4, 2013, Yoe and several other employees who worked with the FITS sock brand were fired by Crescent. Crescent also ended its contract with its two-person IT consulting firm, DataBasix. At all relevant times, DataBasix was a company owned by IT consultant George Ervin ("Ervin"). The day prior, Crescent had filed a lawsuit against Plaintiffs in McMinn County, Tennessee Chancery Court (the "Chancery Court Case") concerning, among other things, the ownership of certain intellectual property.[2]

Ervin, through DataBasix, worked consistently as an IT consultant to Crescent during the time Yoe was employed[3] [Doc. 289-3, Page ID # 5182]. When Crescent terminated DataBasix's

---

[2] In the Chancery Court Case filed September 3, 2013, Crescent sought a declaration that certain contracts and agreements between the parties granting ownership of new brands to YEI and providing a $2 million severance payment to Yoe were void and unenforceable. The next day, Yoe was fired. During the Chancery Court Case, the chancery court entered an injunction that, in part, required Crescent and its officers and directors "to fulfill any and all orders for FITS® and Jacks® products in a timely and appropriate manner, all as required by orders for such products, . . . using the correct and proper materials, packaging, technology, manufacturing specifications and specifications . . . . " [Doc. 24-7 at Page ID # 273]. Additionally, the chancery court entered an agreed injunction that enjoined Crescent "from marketing the FITS® brand products (hereinafter referred to as "FITS®") unless each and every product has been manufactured using the proper materials, proper packaging, proper technology for manufacturing FITS®, proper manufacturing processes, and using all of the same specifications required to manufacture FITS® that were in place as of August 15, 2013 and using all of the same specifications as required by the patent held by [YEI]." [*Id.* at Page ID # 272-73]. On December 29, 2014, an order was entered in the Chancery Court Case in favor of Yoe and YEI declaring various contracts valid and enforceable and holding that YEI was the owner of FITS®, Jacks®, and Game Knits® and all intellectual property associated with the YEI brands and that Yoe was entitled to the $2 million severance payment from Crescent [Doc. 84 at Page ID # 896, ¶ 40; Doc. 24-8].

[3] When Ervin first provided services to Crescent, DataBasix was paid on an hourly basis; but beginning in 2004, it was paid initially $33,000 per month for IT consulting services, which increased in 2005 to $35,000 per month [Doc. 289-3, Page ID # 5191-93].

services and Yoe, Ervin and his son were the only employees of DataBasix and they promptly began working for YEI [Doc. 289-2, Page ID # 5141-42, 5172].

Prior to the terminations in September 2013, Crescent's data was protected via offsite backup to servers managed by DataBasix [Doc. 289-2, Page ID # 5120-23]. At the termination of the DataBasix contract by Crescent, Ervin was in possession of ESI backed up onto servers from Crescent. Ervin sought direction from Yoe and Yoe's attorney, Gary E. Patrick ("Attorney Patrick")—not from Crescent—as to what he should do with that ESI [Doc. 289-2, Page ID # 5139-45].

Ervin gave depositions in both 2014 and 2017. On June 23, 2014, before the data at issue on the hard drive had been destroyed, Ervin testified:

> Q.     Okay. Well, did you – it's my understanding that you provided Bob with some data in regard to Crescent since the firing. Has there been a deletion since that occurred?
>
> A.     I would say so, yeah.
>
> Q.     Let me ask it this way. Do you have any data involving Crescent on any manner of storage device?
>
> A.     Yes.
>
> Q.     Tell me what you have.
>
> A.     I have a portable hard drive backup that's my own.
>
> Q.     And what data or information is on that portable hard drive?
>
> A.     ***Anything that affects the intellectual property of Yoe Enterprises.***
>
> Q.     Where did that data come from?
>
> A.     My server.

Q.    Would it have been copied from the server over on to the portable hard drive?

. . .

A.    Yes.

Q.    Okay.  When did that occur, that transfer?

A.    I'm not sure.

Q.    Was it since September 4th, 2013?

A.    Yes.

Q.    Was it since January of 2014?

A.    I don't know.

Q.    Why did you transfer that information over on to a hard drive, for what purpose?

A.    ***To protect the intellectual property.***

Q.    When you say to protect the intellectual property, are you talking about like the trademark information or –

A.    Anything related to the – when Bob gets the brand back, then he'll need ***the manufacturing specifications*** to be intact and we'll need to use that information to hit the ground running.

[Doc. 289-3, Page ID # 5183-85 (emphasis added)].

In the same 2014 deposition, Ervin testified about what he considered to be YEI data copied to the hard drive:

Q     Why do you say YEI data?

A     Yoe Enterprises' intellectual property is contained in the FITS specifications that were on it.

Q     So on the hard drive do you have the actual knitting specifications?

A     Yes.

4

Q    Okay. Do you have FITS brand sales information that was collected from Crescent?

A    No. I was trying to get the knitting -- the things related to knitting specifications.

Q    Okay. And --

A    Or total manufacturing specifications for FITS.

Q    Okay. And we're just talking about the hard drive right now. We're not talking about the server, okay, because we're going to go back to that server. So you have knitting specs. What else is on there relating to IT?

A    Manufacturing specifications.

Q    Is that different than knitting specifications?

A    Sure. Yes.

Q    When I hear the term knitting specifications, to me that denotes what information is entered into the computer aspect of a knitting machine. Am I right about that?

A    Pretty close.

Q    Okay. In contrast, what does manufacturing specifications involve?

A    Measurements, weights, relationships.

Q    Would that be of yarns and materials --

A    Yes.

Q     -- primarily?

A     Materials, raw materials, and the relationships between those components.

Q    Okay. What else is on the hard drive besides knitting specs, manufacturing specs?

A      There may be some extraneous data that is contained in the databases that contains those information. So stuff I don't look at, but there may be other tables.

Q      Would any of that -- and you said on the hard drive you don't -- there's not any sales data?

A      I didn't say that. I said I don't know.

Q.     Okay. Is it possible that there's on the server that relates to Crescent; is that right?

Q      We're talking about the server now.

Q.     Right. We're talking about the server.

A      I mean, I'm not sure what all is on there. I don't know how to answer that question.

Q      Well, I'm asking you why you still have their data. I'm not asking you what the data is. I'm asking you why you still have it.

A      The data contains intellectual property.

Q      And you've extracted that, right, and put it on the hard drive?

A      The portable hard drive.

Q      Correct.

A      Right.

[Doc. 289-3, Page ID # 5186-88].

Q      Okay. Well, let's say, for example, if you did back up [a company's] data, in your opinion would you own that data if you preserved it for them?

A      No. I would be a steward.

Q      Well, wouldn't that be true of Crescent as well?

A      And Yoe Enterprises at this point, yes.

[Doc. 289-3, Page ID # 5190].

Several years later, in his May 18, 2017 deposition taken in this case, Ervin testified the typical Crescent backup of data included a snapshot of "everything" but did not include design programs, which involved a specialty program; and thus, the knitting machine programs were not part of the data backed up or copied to the hard drive [Doc. 289-2, Page ID # 5124-25]. He also testified that, at times, "pieces" of the design programs were backed up [Doc. 289-2, Page ID # 5126-29].

Turning to why he copied the data to a hard drive, Ervin testified in 2017 that he asked Yoe and Attorney Patrick what to do with the information "that looked like it was Crescent" contained on the backup servers that was "stuff that belonged to [Yoe]." [Doc. 289-2, Page ID # 5140]. Ervin swore he made a "safekeeping copy" of that data on the servers because he "asked the lawyers and we decided to preserve it, get it off those servers and preserve it onto a backup copy." [*Id.*]. Plaintiff's counsel asserted an attorney-client privilege and instructed Ervin not to answer questions about any discussion Ervin had with Yoe with counsel present about preserving the data to the hard drive because Ervin "[was] an employee of YEI at the time" of this discussion [Doc. 289-2, Page ID # 5142-45 & 5160-61].[4]

After Ervin's discussion with counsel, and within no more than two weeks of the September termination, Ervin preserved the data on an external hard drive with two terabytes of capacity by taking the following steps:

---

[4] Ervin testified he was not sure if he was an employee of YEI in September of 2013 and described not being "technically" an employee because he received a 1099 [Doc. 289-2 at Page ID # 5150-51]. The record reflects Ervin received a 1099 for work with Yoe/YEI in 2014 in the amount of $100,000 and stopped working for them in April of 2015 [*id.* at 5173-74].

Q.      So after you had conversations with [Yoe] and [Attorney Patrick] about what to do with it, what did you do with the data?

A       I put it on a backup copy, a backup hard drive.

Q       Okay. What type of hard drive was it?

A        It was a USB external removable type thing.

Q       Okay. Who provided you that removable external USB hard drive?

A       I can't remember. I went and bought it.

Q       You went and bought it specifically for this task?

A       I think so.

Q       Okay. So at some point in time you discovered the data. You had a conversation.  Then afterwards you went and purchased a portable USB external hard drive and then you made a copy of the data?

A       Yeah.

Q       Was it all the data, everything that you saw was there, or did you discriminate some data to copy and others not to?

A       I'm not sure of the exact technical steps I took. I think I deleted some stuff that was -- if there was more than one copy, may have got rid of duplicates.

Q       Sure.

A       And then just sort of took a broad brush and threw it on there.

Q       So other than sort of de-duping multiple backup copies, you took everything that was there and put it on a hard drive?

A       Everything I saw in one blush, yes.

Q       Okay. And then you went back and did you -- what did you do with the data that was still residing on the storage device at the time? Not the portable hard drive, but the sort of --

the original, where the data was originally where you found it?

A       I started the process of actually removing pieces of information.

Q       Okay. So you wanted to clean up that device to get anything involving Crescent off of it?

A       Sure.

Q       And this device that you were doing, this storage station, was this one that was purchased by Crescent or by DataBasix?

A       I'm sorry, the --

Q       The storage device where you originally found the data from which you took a copy onto the hard drive?

A       It was on several devices, some that were purchased by DataBasix and some that were purchased by Crescent.

[Doc. 289-2, Page ID # 5146-5148].

Q       Okay. So you found the data. You bought a hard drive. You made a copy of the data.  Did Mr. Yoe ask you to make a copy of that data?

A       I can't answer that.

Q       You can't or you won't?

A       We're -- attorney-client privilege.

Q       I'm not asking you if Gary told you.  I'm asking you if the CEO told you --

MR. PATRICK: If I was in the room he can't --

A       I only had discussions with Gary, I mean, that I can remember when Gary was in the room about that.

Q       Did you have discussions with Mr. Yoe separate and apart from Gary?

> A    I can't remember.

[Doc. 289-2, Page ID # 5150].

Ervin testified during his 2017 deposition that after he copied Crescent's data from the backup servers onto a hard drive, he might have taken the external hard drive to his home and it was eventually "repurposed." [Doc. 289-2, Page ID #5152-53]. Ervin could not recall if the hard drive was ever given to Yoe or Attorney Patrick [*id.*].

Regarding the destruction of the data, Ervin swore:

> Q    Okay. How long did it -- how long was the data copy that you made maintained on that hard drive before you restructured it or reformatted it?
>
> A    It was a few weeks. It was at least a couple of -- a few weeks.
>
> Q    So what was the purpose of making that copy?
>
> A    Just -- well, we discussed that in –    I can't answer that.
>
> Q    I'm not asking you to tell me what anybody said. I'm saying what was the purpose of making the copy? You made the copy, what was your purpose?
>
> A    To be a good servant.
>
> Q.   Okay. I think you testified earlier in your deposition from 2014 that -- you testified about a specific purpose of making that copy.
>
> A    Well, yeah, but this is after I was an employee there and --
>
> Q    I'm talking about the same actions and the same events at the same time. You didn't view it as attorney-client privilege in June of 2014, but all of a sudden now you do.

[Doc. 289-2, Page ID # 5153-54].

> A    I don't remember what I said back then.

Q      I'm not asking what you said. I'm asking what was the purpose of making the copy of Crescent data?

A      It's to back up information. I said earlier today it's to back up information that could belong to Mr. Yoe.

Q      Okay. So I assume that whatever you did in the weeks following that event prior to reformatting the hard drive was to further the purpose of backing up that -- or copying or protecting that data. Or was there a point a couple of weeks later where you said, you know what, I'm going to abandon that altogether? Does the copy of the data that you made back then still exist somewhere?

A.     No.

Q      To your knowledge?

A      To my knowledge, no.

Q      You destroyed it?

A      Yeah.

Q      The only copy?

A      Yeah.

Q      It wasn't copied by anybody else on any third device before you destroyed it?

A      It was not copied, no.

Q      Who told you to destroy it?

A      Nobody.

Q      You just had a change of heart?

A      I just thought it would be prudent. I mean, there was so much discussion.

Q      Do you think what you did was wrong?

A      No.

Q        So why did you delete it?

A        Because there was -- the situation became clear after the fallout of the initial firing and the unsettled what was going to happen next type questions, you know, we didn't know – I didn't know if these guys would make up and do the right thing and work together and -- you know, so once that became sort of clear as to what the situation was it was like, wow, you know. That was --

Q        So what became clear about the situation, that they weren't going to make up?

A        Yeah. It was going to be a long, drawn out process.

Q        So what about that provided you the -- why would you have deleted it knowing that in view of the fact that these people weren't going to make up and reunite?

A        Well, the information has a shelf life, and if you're going to work with it or do something with it then you want to use it and work together while it's meaningful.  ***And then the information like the knitting programs or anything that could be used to manufacture socks was not on there, so I -- after further examination, so I said, they didn't need it.*** And since they didn't need the information, it was gone.

Q        Who didn't need it?

A        There was no purpose or working for anyone that -- it's hard to know how to say this one when the discussions were -- I determined whether it was needed or not. And since **I found out it wasn't needed anymore**, I deleted it.

Q        How did you make that determination?

A        **By finding out from decision makers**.

Q        Okay. Did you examine the data on the hard drive?

A        Not much, no.

Q        How did you know what it had and what it didn't have?

A        By directory names.

Q    So you looked at it at least insofar as identifying directory names?

A    A few things. A few things.

Q    Okay. What did you see on there?  Did it have specific documents?

A    I saw virtual machines and some backups of -- I think some image thumbnails and many other things I can't remember.

Q    Okay. Do you recall how large volume-wise the hard drive was that you purchased to make a copy?

A    Yeah.

Q    What was it?

A    Two terabyte.

Q    Do you know how full it was after putting the copy on it?

A    No, but it was -- it didn't -- it was way overkill. It was not -- it was very empty.

Q    So you had a single -- one single copy on the hard drive that you then took home where it stayed for a few weeks?

A    Yeah. I think it was mostly there.  I can't remember exactly if it moved around at this point.

Q    And who had access to that? During those weeks, who would have had access to that hard drive? Yourself?

A    Myself, Bain, my son.

Q    Mr. Yoe?

A     No, he didn't. No.

Q    And so after a few weeks of only yourself and Bain having access to that hard drive you then made a unilateral determination to delete the data that you copied?

A    Unilateral meaning that I made it with no other input of my own decision? Is that what you mean?

Q      Yes.

A      Okay. Yes.

Q      And, again, I'm trying to understand why, if you had a two terabyte hard drive that was practically empty, your words, so you had all kinds of space still on it, you could put whatever else you wanted on the hard drive, why did you feel a need to delete it?

A      Well, deleting the information was about getting the information out of my possession, not about the space on the hard drive.

Q      Why did you think it was okay to get the information out of your possession? Why did you think it was okay or necessary?

A      I think I said that there was no purpose in keeping it.

Q      But you knew there was a lawsuit pending, right?

A       Yeah.

[Doc. 289-2, Page ID # 5154-59 (emphasis added)].


Q      . . . I'm asking him did he tell Mr. Yoe or any of his representatives that he deleted the hard drive at any point in time.

A      I don't remember.

Q      You don't remember?

A      No.

[Doc. 289-2, Page ID # 5161].

Ervin acknowledged in both depositions that Yoe asked Ervin to furnish information from the copied data [Doc. 289-2, at Page ID # 5163-5171, 5190-91]. Ervin then directed his son to obtain information regarding salaries of Yoe and Crescent shareholders or top executives

and possibly others from either the Crescent backup server or the hard drive Ervin created [Doc. 289-2, at Page ID # 5163-5170, 5190-91].

During Yoe's deposition in August 2017, Yoe could not remember if he asked Ervin to make the copy of the data placed on the hard drive. [Doc. 289-5]. At the time of this recent deposition, Yoe's knowledge of the intellectual property copied to the hard drive was:

> I don't remember if I did or I didn't ask him to preserve a backup copy of anything that would have had my intellectual property on it, but if I had thought he would -- he had that, I mean, then I might have. I don't think he had copies of that is why I'm belaboring this.

[*Id*. at Page ID # 5204]. However, Yoe submitted a declaration dated September 15, 2017 in response to the pending motion stating that Ervin was "never able to accomplish a proper backup of knitting machine programs" and he "**knew** there were no complete knitting machine programs on the portable hard drive that Mr. Ervin had after I was terminated by Crescent." [Doc. 341-2, at Page ID # 8351 at ¶¶ 2-3 (emphasis added)].

Mitchell Beckler's ("Beckler") declaration also asserts that the "complete and useable" knitting machine programs used to manufacture FITS socks were not among the data that "Ervin backed up," which was why it was necessary to "redevelop the FITS knitting machine programs." [Doc. 341-3, at Page ID # 8354 at ¶¶ 6-8].

Crescent submits evidence to the contrary. Stacy Wally Arms ("Arms"), Crescent's current IT Manager who was employed at Crescent during the relevant time period, submitted a declaration in support of the motion by Crescent [Doc. 289-4]. Arms declares that DataBasix/Ervin supplied "off-site backup and maintenance of [Crescent's] data" and that "[p]rior to September 4, 2013, Crescent arranged for scheduled backups of a portion of its electronic data to a Network Attached Storage Device ("NAS") located off-site and connected to Crescent's network via a VPN tunnel." [Doc. 289-4, Page ID # 5195]. Arms declares that one

of the scheduled back-ups to the off-site DataBasix NAS was data from Crescent's "'Graphics' shared network folder" and the Lonati I "primary development workstation," which was the workstation where Crescent's "library of knitting machine programs" were stored, including folders titled "graph5" and "Graph6" on the workstation directory [*id.* at 5196]. Arms also declares that it appears from Crescent's records that Crescent's primary development workstation computer was backed up to the servers at DataBasix on September 3, 2013 [*id.* at 5196].

In addition, Crescent argues Beckler's expert report contradicts his declaration because it endorses that the FITS sock knitting machine programs were located within the "Graph6" folder at Crescent [*see* Doc. 336-8]. As noted above, Arms declares that, among other sock programs, the FITS Sock knitting machine programs were in the "graph5" and "Graph6" folders located on the "Lonati 1" development workstation in 2013, which was last backed up to the offsite servers at DataBasix on September 3, 2013 [Doc. 289-4 at Page ID # 5195-96 ¶¶ 4-8].

## II. SPOLIATION STANDARDS

Undoubtedly, lost or destroyed evidence may give rise to a claim of spoliation. Spoliation is the destruction or material alteration of evidence or the failure to preserve evidence once a duty to preserve attaches. *See Ross v. Am. Red Cross*, 567 F. App'x 296, 301-02 (6th Cir. 2014) ("Spoliation is 'the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction.'") (quoting *United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003)). Federal law provides the legal standard for determining whether spoliation occurs and what, if any, sanctions should be imposed for the spoliation. *See Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (en banc). A district court's imposition of sanctions for spoliation will be reviewed for an abuse of discretion. *Id.* at 653.

The authority to impose sanctions for spoliation of ESI, as alleged here, now comes from Federal Rule of Civil Procedure 37(e), which was substantially amended effective December 1, 2015. Rule 37(e) applies only to the loss of data; and, it governs the burden of proof and available sanctions for failure to preserve ESI.[5] This current version of Rule 37(e) applies to civil cases commenced after December 1, 2015, "and, insofar as just and practicable, all proceedings then pending." *Palmer v. Allen*, No. 14-CV-12247, 2016 WL 5402961, at *1 (E.D. Mich. Sept. 28, 2016) (quoting 2015 U.S. Order 0017; 28 U.S.C. § 2074(a)).

Although not addressed by the parties, the Court finds it is "just and practicable" to apply amended Rule 37 in this case. Though the case was filed in this Court in early 2015, and the alleged spoliation took place in 2013, the application of Rule 37(e) is just and practicable because "[w]hile the language of the rules changed, the spirit and principles underlying them have not materially changed in a manner adverse to [the moving party]." *Konica Minolta Bus. Sols., U.S.A. Inc v. Lowery Corp.*, No. 15-CV-11254, 2016 WL 4537847, at *3 (E.D. Mich. Aug. 31, 2016) (noting the similarities and distinctions between the two versions of Rule 37(e) and applying amended Rule 37(e) to alleged conduct occurring before the rule amendment) (alteration in original).

Rule 37(e) provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to

---

[5] Case law before December 1, 2015, still applies to the loss of physical objects such as paper. That case law reflects a split among the circuit courts on the level of scienter required for the imposition of spoliation sanctions and the availability of adverse inferences.

<blockquote>

cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

    (A) presume that the lost information was unfavorable to the party;

    (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

    (C) dismiss the action or enter a default judgment.

</blockquote>

Significantly, subsection (e)(1) does not contain an "intent" requirement; thus, a party need not act willfully, deliberately, intentionally, or with any objective or subjective bad faith. Under subsection (e)(2), however, before certain sanctions are imposed, the court "must find that the party that caused the loss 'acted with the intent to deprive another party of the information's use in the litigation.' Sanctions under (e)(2) include an adverse presumption, an adverse instruction to the jury, or default judgment." *Konica Minolta Bus. Sols., U.S.A. Inc.*, 2016 WL 4537847, at \*3.

Sanction authority for the loss of ESI may also derive from other sections of Rule 37 and possibly from the inherent power of a court.[6] *See Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 513 (6th Cir. 2014) ("A federal court's inherent powers include broad discretion to craft proper sanctions for spoliated evidence.") (quoting *Adkins*, 554 F.3d at 651).

---

[6] The Advisory Committee Note to amended Rule 37(e) states that the rule preempts resort to inherent power. *See also Living Color Enters., Inc. v. New Era Aquaculture, Ltd.*, No. 14-cv-62216, 2016 WL 1105297, at \*4 & n.2 (S.D. Fla. Mar. 22, 2016). At least one court, however, has noted (in what might be considered dicta) that inherent power remains available. *Cat3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 497-98 (S.D. N.Y. 2016). As held in *Dietz v. Bouldin*, 136 S. Ct. 1885, 1891 (2016) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962)), federal judges have an inherent authority to "manage their own affairs so as to achieve the orderly and expeditious disposition of [civil] cases." Defendants cite to *In re McCarty*, 644 F. App'x 372, 378 (6th Cir. 2016) in connection with a passing reference to the Court's inherent authority, but that case focused on the spoliation of a ladder, lanyard and harness after a fall, not spoliation of electronic data since cell phone text messages were available from other sources.

The Court will determine whether sanctions, otherwise known as remedial measures, under amended Rule 37(e) should be awarded; and, if so, what remedial measures should be imposed.

## III.    ANALYSIS

YEI alleges that Crescent, as YEI's sole licensee, denied YEI access to YEI's own intellectual property for producing FITS socks and that "without access to the FITS specifications and programs at Crescent, the FITS team had to recreate the technology from memory as best they could." [Doc. 227 at Page ID # 3188-89]. The parties agree that, among other categories of damages, YEI seeks to recover close to $2 million for costs and expenses it allegedly incurred in order to recreate its FITS-related intellectual property. Plaintiffs' response to the motion for sanctions does not address Defendants' claim that these alleged re-creation damages are "untethered to any pending claim in this lawsuit." [Doc. 289]. In numerous prior filings with the Court, YEI asserted that Crescent had the "complete Graph 6 copies" of the knitting programs at issue and faulted Crescent's for its "failure to properly preserve the programs in the exact format as they existed as of September 2013." [*see e.g.*, Doc. 245 at Page ID # 3667; Doc. 247 at Page ID # 3706].

A step-by-step analysis under Rule 37(e) concerning the loss of the backup data copied to the hard drive involves the following determinations. First, was there a duty to preserve the data in issue? If not, the analysis ends. Second, were reasonable steps taken to avoid the loss of the data? If so, the analysis ends. Third, can the lost data be "restored or replaced" through additional discovery? If so, the analysis ends. Fourth, was the other party prejudiced by the loss of the data? If not, the analysis ends, but if there was prejudice, the court can impose "measures no greater than necessary to cure the prejudice." Such measures may include, allowing the injured party to comment on or introduce evidence about the lost data at trial. If data were lost

"with the intent to deprive another party" of the use of the lost data, prejudice is assumed and the court can allow a permissive or mandatory adverse inference or impose a case-terminating sanction. The party alleging spoliation has the burden of proof. *See Byrd v. Alpha Alliance Inc. Corp.*, 518 F. App'x, 380, 383-84 (6th Cir. 2013).[7]

### A. Application of the Spoliation Criteria

#### 1. Did Plaintiffs Have a Duty to Preserve the Data?

An obligation to preserve evidence exists when the party should have known that the evidence may be relevant to future litigation. *Beaven v. U. S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010). Ervin, after discussion with Yoe and Attorney Patrick, made a copy of data on the backup servers to the hard drive for safekeeping purposes. Plaintiffs have not seriously contested that they had a duty to preserve the data copied to the hard drive (and perhaps the data on the backup servers as well).

By at least September 4, 2013, Ervin considered himself a "servant" of YEI and a steward of its data in the backup servers managed by DataBasix. Ervin was paid by YEI from September 2013 through at least April 2015, after this action was filed January 6, 2015. Ervin acted at Plaintiffs' direction to obtain at least certain salary and product cost information from the hard drive. Counsel for Plaintiffs instructed Ervin not to answer certain questions regarding communications about the preservation of the copied data to the hard drive because Ervin was an "employee" of YEI's during the communications and the communications were asserted to be covered by the attorney-client privilege. Even if DataBasix or Ervin received a Form 1099 for

---

[7] There is an open issue as to whether the imposition of Rule 37(e)(2) sanctions requires proof by preponderance of the evidence or by clear and convincing evidence. *Compare Cat3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488 (S.D.N.Y. 2016) (clear and convincing), with *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772 (7th Cir. 2016) (preponderance of the evidence). The parties did not address the standard of proof issue.

his work for YEI, there is no question that he sought direction from, and followed the instructions of, Plaintiffs with respect to the collective decision to copy the data to the hard drive and, later, to search it for information related to the Chancery Court Case.

Plaintiffs have made no cognizable claim that once the data was on the hard drive they had no duty to preserve the data. Accordingly, the analysis proceeds to the next step.

### 2. Were Reasonable Steps Taken by Plaintiffs to Avoid the Loss of the Data?

Plaintiffs did not take reasonable steps to preserve the data on the hard drive.[8] It may have been reasonable to delete the information from the backup servers once it was preserved to the hard drive, and that issue does not appear to be contested. Once Ervin transferred the information from the back up servers to the hard drive (after attorney-client conversations with Yoe and Attorney Patrick), Plaintiffs failed to exercise sufficient control of the data. While they were able to request and obtain certain salary and product information from the data, they seemed to have taken absolutely no steps to preserve the data on the hard drive. That Plaintiffs could have, but did not take steps to preserve the data on the hard drive has not been seriously disputed and Plaintiffs' failure to maintain control of that data is seemingly indefensible.

The Court finds reasonable steps were not taken by Plaintiffs to preserve the data when they allowed Ervin to take the hard drive home at will and when they failed to exercise control over what he did with the data on the hard drive. Thus, the analysis proceeds.

### 3. Can the Lost Data Be "Restored or Replaced" with Additional Discovery?

With respect to the hard drive, Ervin used a "broad brush" to copy all available Crescent back-up data to the hard drive intending to capture the FITS knitting and manufacturing specifications for Plaintiffs. Included among the copied backed-up data were, at least, "pieces"

---

[8] While not entirely clear, it appears largely undisputed that the information no longer remains on the back up servers managed by Ervin.

of data about YEI's intellectual property. The dispute with respect to this factor lies with whether the data contained complete FITS knitting machine programs. Plaintiffs argue there is no spoliation because the data on the hard drive was merely a copy of a backup of certain information on a server and the original information remained in Crescent's control in its original format and thus no original information has been lost. Plaintiffs also argue that their extensive and costly efforts to recreate the FITS sock knitting programs demonstrate the data on the hard drive did not contain the necessary data to manufacture the FITS sock.

It is unknown exactly when the hard drive was erased so the Court does not know if the data was available during the protracted discovery process. The parties are at the eve of trial and discovery was closed before the motion for sanctions was even fully briefed. It is not entirely clear when Defendants first became aware of the destruction of the data on the hard drive but certainly they knew when Ervin was deposed in 2017 and likely before that deposition. In fact, it appears that Ervin deliberately deleted the data from the hard drive years ago. Neither side of this dispute has suggested that a mirror image of what was on the hard drive could be created today from available records.

While Crescent produced data in the discovery process in this case apparently sufficient for YEI to recreate its intellectual property, Crescent claims the production came at a tremendous effort and cost to Crescent. Correspondingly, YEI claims that re-creation of its own intellectual property from the data provided by Crescent came at an expense of some $2 million to Plaintiffs. As a result of the loss of the data on the hard drive, determining exactly what information was readily available from the hard drive and in YEI's hands at the inception of this dispute in 2013 from the data copied to the hard drive appears to be forever lost. It is not known how this data would have impacted the parties' efforts to recreate the intellectual property/technology at issue.

As the exact data copied to the hard drive cannot be restored or replaced at this time, the analysis continues.

### 4. Was Crescent Prejudiced by the Loss of the Data?

Rule 37(e) eliminates the requirement of a culpable state of mind; instead, the rule now focuses on prejudice to the moving party. The prejudice prong of the spoliation analysis relates to the issue of the relevance of the last data. "Prejudice—properly understood as a party's ability to obtain the proofs necessary for its case—is not an entirely new element; the prior Rule's 'relevance' inquiry focused on a party's ability to present its case; the prior Rule required the moving party to show that a 'reasonable trier of fact could find that [the lost ESI] would support that claim or defense,' which is another way of saying the loss of ESI could negatively impact a party's ability to make its case, or prejudice that party because of the loss of information." *Konica Minolta Bus. Sols., U.S.A. Inc.*, 2016 WL 4537847, at *3 (alteration in original).

Prejudice under Rule 37(e) may be found where a party has been required to "piece together information from other sources to try to recover relevant documents." *Moody v. CSX Transp., Inc.*, No. 07-CV-6398P, 2017 WL 4173358, at *13-14 (W.D.N.Y. Sept. 21, 2017) (quoting *In re: Ethicon*, *Inc.*, No. 2:12-cv-00497, MDL No. 2327, 2016 WL 5869448, *4 (S.D. W. Va. 2016)). Although not binding on this Court, at least one court has held that "[t]o show prejudice resulting from the spoliation, a party must only come forward with plausible, concrete *suggestions* as to what [the destroyed] evidence *might have been.*" *TLS Mgmt. & Mktg. Servs. LLC v. Rodriguez-Toledo*, No. CV 15-2121 (BJM), 2017 WL 1155743, at *1-2 (D.P.R. Mar. 27, 2017) (finding prejudice where party "plausibly suggest[ed]" that a discarded laptop "might have" contained documents or information relevant to the action) (alterations and emphasis in original; internal quotation marks omitted) (quoting *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d

1311, 1328 (Fed. Cir. 2011) (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79-80 (3d Cir. 1994))).

Courts in the Sixth Circuit have held the movant for sanctions need only show that the spoliated evidence *could* have been useful to the claim or defense. *See e.g., Jones v. Staübli Motor Sports Div.,* 897 F. Supp. 2d 599, 609 (S.D. Ohio 2012) (citing *Beaven*, 622 F.3d at 553). In addressing the relevance of spoliated physical evidence, the Sixth Circuit has held that courts are not to inquire whether the lost or destroyed evidence was dispositive; rather, the proper nquiry is whether the movant has made "some showing indicating that the destroyed evidence would have been relevant to the contested issue . . . such that a reasonable trier of fact could find that it would support that claim." *McCarty,* 644 F. App'x at 379 (internal citations and quotation marks omitted) (holding that a court abuses its discretion if it applies a "heightened relevancy standard" to a request for spoliation sanctions).

The advisory committee's notes to Rule 37(e), prove instructive by explaining:

> The rule does not place a burden of proving or disproving prejudice on one party or the other. Determining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair. In other situations, however, the content of the lost information may be fairly evident, the information may appear to be unimportant, or the abundance of preserved information may appear sufficient to meet the needs of all parties. Requiring the party seeking curative measures to prove prejudice may be reasonable in such situations. The rule leaves judges with discretion to determine how best to assess prejudice in particular cases.

Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

There is no doctrine within the Sixth Circuit holding that spoliated evidence is only relevant if it was the only evidence a party could have used to prove a claim or defense. And, at least one court within the Sixth Circuit has specifically rejected such an argument. *See Pollard*

*v. City of Columbus*, No. C2-11-CV-0286, 2013 WL 5334028, at *5 (S.D. Ohio Sept. 23, 2013). In *Pollard*, the plaintiff's son was shot and killed by police while driving a vehicle, and the vehicle was riddled with bullet holes. Plaintiff brought an action under 42 U.S.C. § 1983 for the death of her son. Police impounded the vehicle in which the son was killed and, despite a request to hold the vehicle, it was later destroyed. The *Pollard* court stated, "[a]lthough Defendants have exhaustively listed alternative sources of evidence that the Plaintiff might employ in its case, that is not the proper inquiry. Rather Circuit precedent requires only that the evidence be 'relevant' to a claim or defense." *Id.* (citing *Beaven*, 622 F.3d at 553). The *Pollard* court found "[a] reasonable trier of fact could find that an opportunity to further examine and inspect the vehicle itself would support the claims asserted by the Plaintiff." *Id.*

Considering the above guidance and finding the reasoning of *Pollard* persuasive, the Court, in its discretion, finds the data at issue in this case would, and certainly could, be relevant to a claim or to a defense. Based mostly on Ervin's 2014 testimony and Arms' declaration, Crescent states that the data copied to the hard drive from Crescent's backup servers contained relevant evidence of the FITS socks-related intellectual property in YEI's possession after the terminations—particularly the knitting specifications for that sock. Crescent mainly argues that YEI prejudiced its ability to defend against YEI's claim for costs allegedly incurred in recreating the FITS-related knitting programs and other intellectual property data. YEI relies on Ervin's 2017 testimony to claim the data he destroyed did not include any useable knitting machine program information. Ervin's 2014 testimony, however, indicates there was data on the hard drive at least relevant to the issues raised in both the Chancery Court Case and this case. In 2014, Ervin swore that the data included anything that affects YEI's intellectual property, including actual knitting specifications.

Even if Ervin's testimony from 2017 can be reconciled with his 2014 testimony as indicating the intellectual data was incomplete and potentially useless for purposes of being able to manufacture FITS socks, it would not end the inquiry. The Court is aware of both Crescent's evidence of the regularly scheduled snapshots of the "Lonati 1" workstation, which reportedly encompassed folders containing the knitting machine programs, and Plaintiffs' evidence that the snapshots were far from complete information. The issue at hand, however, is not whether YEI could make the FITS sock using only the data on the hard drive, the question is whether the data on the hard drive contained evidence relevant to a claim or a defense; and, the Court finds that it did. Whether the hard drive data contained all or merely part of the knitting programs located in the folders on the "Lonati 1" development workstation, which allegedly were recreated at great expense, will never be known for sure because of the destruction of the hard drive data. Therein lies the rub: evidence "relevant" to the $2 million re-creation damages claim was destroyed when the hard drive was repurposed.

Plaintiffs vigorously argue the destroyed "design" data copied to the hard drive was entirely insufficient to avoid the re-creation expenses and efforts. To be sure, however, nobody will ever know if all of the great expenses incurred by Plaintiffs to recreate the technology information was required because the copied data was destroyed. As argued by Crescent, neither Yoe nor Beckler have claimed that they actually reviewed the data copied to the hard drive. Instead, their declarations and testimony raise a factual dispute about the extent of the design information copied to the hard drive. As the data on the hard drive has been destroyed, that dispute will remain unresolved resulting in at least some prejudice to Crescent's defense of the damages claim.

The deletion of the data has adversely affected Crescent's ability to find and prove the extent of the data that Plaintiffs took and had available. Such information could have been probative to the issue of Plaintiffs' claimed costs for the reconstruction of its own intellectual property. The spoliation may significantly hamstring Crescent's efforts to show the reconstruction costs were unnecessary or, at least, exaggerated. As a result, the Court must consider and impose "measures no greater than necessary to cure the prejudice."

### B. Applying Measures No Greater Than Necessary to Cure the Prejudice

Prior to implementation of amended Rule 37(e), the Sixth Circuit held sanctions could be imposed for spoliation of evidence, if three requirements were established by the moving party: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Beavene*, 622 F.3d at 553 (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107-12 (2d Cir. 2002)); *see also Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1070 (6th Cir. 2014); *Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 513 (6th Cir. 2014); *Byrd*, 518 F. App'x at 383-84.

The "culpable state of mind factor" can be established by conduct ranging from negligent to intentional conduct in the Sixth Circuit. *Beaven*, 622 F.3d at 554 ("[T]he 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or *negligently*.'") (brackets original, emphasis original) (quoting *Residential Funding Corp.*, 306 F.3d at 108)); *see also McCarty*, 644 F. App'x at 378 (holding negligence is sufficient to find a "culpable state of mind" to support spoliation).

While some circuits had required a showing of willfulness or bad faith before a court could dismiss a case, enter judgment by default, or utilize an adverse inference, the Sixth Circuit permitted such sanctions upon a finding that the party that had lost or destroyed evidence had acted negligently. Sanctions under this *Residential Funding* standard range anywhere from instructing a jury that it may infer a fact based on lost or destroyed evidence to granting summary judgment. *See e.g.*, *Beaven*, 622 F.3d at 554; *Byrd*, 518 F. App'x at 385-86. Other potential sanctions may include fines and attorney's fees and costs. *AMG Nat'l Trust Bank v. Ries,* Nos. 06-CV-4337, 09-CV-3061, 2011 WL 3099629, at *4 (E.D. Pa. Jul. 22, 2011) (*citing Paramount Pictures Corp. v. Davis,* 234 F.R.D. 102, 110–11 (E.D. Pa. 2005)). "There is no rule of law mandating a particular sanction upon a finding of improper destruction or loss of evidence; rather, such a decision is left to the discretion of the Court." *AMG,* 2011 WL 3099629, at *4 (quoting *Paramount,* 234 F.R.D. at 111).

Rule 37(e) now reserves the harshest sanctions, such as adverse inference instructions, summary judgments or dismissals, only for cases in which the court can "fin[d] that the [spoliating] party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2).[9] When imposing sanctions under Rule 37(e)(1), "[t]he range of [curative] measures is quite broad" and "much is entrusted to the court's discretion." Fed. R. Civ. P. 37(e) advisory committee's note. As stated in the advisory committee's note, "it may be that serious measures are necessary to cure prejudice found by the court, such as forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of

_____

[9] The Rules Advisory Committee explicitly rejected the *Residential Funding* standard, and instead found that severe sanctions are only permitted where the court finds an "intent to deprive another party of the information's use in the litigation," Fed. R. Civ. P. 37(e)(2).

information, or giving the jury instructions to assist in its evaluation of such evidence or argument, other than [adverse inference instructions]."

Both monetary and non-monetary sanctions are available under Rule 37. *See* Fed. R. Civ. P. 37(b)(2). Such monetary sanctions may include attorney's fees incurred in filing the instant motion, as well as the attorney's fees and any other costs incurred in attempts to recreate and provide the destroyed data. Additionally, where spoliation has occurred, monetary sanctions may include compensation for the expenses incurred in addressing other motions or hearings that were a direct result of the deletion of the data or to compensate a party for the time and effort it was forced to expend in discovery. *See e.g., Mosaid Techs., Inc. v. Samsung Elecs. Co., Ltd.*, 348 F. Supp. 2d 332, 339 (D.N.J. 2004).

Arguing the destroyed data included all of the FITS-related intellectual property that YEI recreated after the hard drive was destroyed, Defendants argue for the harshest of sanctions. Defendants seek to both preclude YEI from seeking to recoup the alleged $2 million in costs and expenses incurred in order to make use of the FITS-related intellectual property and an award of their attorney's fees and costs for addressing "unnecessary discovery disputes" and the sanctions motion [Doc. 289 at Page ID # 5086-87]. Although Defendants apparently threatened Ervin with potential criminal liability for having the data, they did not cite to evidence of what steps they asked him to take to either safeguard or return the data or when they first learned that he no longer possessed the data or what he had done with it.

When Ervin deleted the hard drive, he and the parties knew a lawsuit was or would be pending regarding the FITS brand. While not entirely clear given the, at times, over-the-top colloquy of counsel in the deposition, Ervin testified in 2017, that the reason he destroyed the data on the hard drive (apparently at some time after his 2014 deposition) was to remove the

information from his possession. Ervin was not able to recall if he advised Yoe and Attorney Patrick of doing so. Viewing the portions of Ervin's testimony provided indicates that he may have deleted the hard drive in response to concerns about possible criminal liability raised by Crescent around his possession of the "stolen" data on the hard drive [*see also* Doc. 341-5].

Regardless of Ervin's motives, however, the Court finds that this destruction warrants sanctions under Rule 37(e) because Plaintiffs took no steps to safeguard the data from destruction. However, the Court also finds sanctions are warranted only under Rule 37(e)(1), not Rule 37(e)(2).

While Plaintiffs' conduct in allowing Ervin to maintain the hard drive—resulting in his having the complete discretion to destroy the hard drive data in this case—is easily considered grossly negligent,[10] Crescent has failed to show the conduct was intentional for the purpose of depriving Crescent of the information's use in litigation to invoke Rule 37(e)(2) remedial measures. Moreover, while the evidence submitted establishes that Ervin knowingly destroyed the data even though he, and Plaintiffs, knew intellectual property would be at issue in the parties' dispute, the proof also indicates he did so mostly out of his own concern that Crescent might take actions against him personally for having and using the data. It is unknown whether DataBasix was requested to preserve the data on the hard drive. Although Ervin's personal liability concerns certainly do not excuse his actions, it does not constitute evidence that he intended to deprive Crescent of the data's use in litigation with Plaintiffs.

---

[10] Gross negligence has been defined as, "[s]uch entire want of care as would raise a presumption of conscious indifference to the consequences." *Livingston v. High Country Adventures, Inc.*, 156 F.3d 1230, *3 (6th Cir. July 30, 1998) (quoting *Craig v. Stagner*, 159 Tenn. 511, 19 S.W.2d 234, 236 (Tenn.1929) (*abrogated on other grounds by McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992)); *see also Helton v. Reynolds*, 640 S.W.2d 5, 10 (Tenn. Ct. App. 1982) (Gross negligence is indicated by a conscious neglect of duty or a callous indifference to consequences.).

However, the loss of the data could have been easily prevented by Plaintiffs. Moreover, Plaintiffs knew or should have known the importance of avoiding data loss in the Chancery Court Case (and later, this case). By invoking the attorney-client privilege, Plaintiffs have curtailed Crescent's discovery into Ervin's actions to some degree, but Crescent did not challenge this invocation of the privilege in a discovery motion. As a result, scant information has been presented to address topics such as why Plaintiffs did not assume control of the hard drive. Regardless, by allowing Ervin to do whatever he wished with the hard drive data, Plaintiffs have demonstrated a disregard of the duty to preserve relevant data. Nevertheless, implementation of possible remedial measures has been complicated by Defendants' failure to seek such measures (at least to the Court's knowledge) until now.

Defendants mainly seek a ruling preventing or limiting YEI's attempt to recoup any of its alleged $2 million in costs for recreating the FITS sock-related technology. Given the Court's contemporaneous ruling on the summary judgment motions, it is not clear to the Court how any such costs could be recovered in the claims that remain pending in this action, but the Court has insufficient information at this time and the parties have not been able to consider the summary judgment ruling yet. If Plaintiffs intend to attempt to pursue such costs given the Court's grant of partial summary judgment to Crescent in this action, the Court will hear from the parties at the final pretrial conference as to what, if any, non-monetary remedial measures are proper in light of this Order.

The Court will **RESERVE** ruling on the imposition of any monetary remedial measures until any post-trial motions are addressed so that the parties may be fully heard at an evidentiary hearing regarding the propriety and extent of any such measures without distracting either the Court from addressing the numerous motions recently filed or the parties' trial preparations.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion for sanctions pursuant to Federal Rule of Civil Procedure 37(e)(1) [Doc. 288] is **GRANTED** only as set forth herein.

SO ORDERED.

ENTER:

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE