UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

ROBERT H. YOE, III, *et al.*,           )
                                        )
            Plaintiffs,                 )     Case No. 1:15-cv-3-SKL
                                        )
v.                                      )
                                        )
CRESCENT SOCK COMPANY, *et al.*,        )
                                        )
            Defendants.                 )

## MEMORANDUM AND ORDER ON RECONSIDERATION
## AND SCHEDULING ORDER

Before the Court is a motion for revision with an accompanying memorandum filed by

Plaintiff Yoe Enterprises Incorporated ("YEI")[1] pursuant to Federal Rule of Civil Procedure 54(b)

[Docs. 458 & 459].  In the motion, YEI seeks a revision of the Court's November 14, 2017,

memorandum and order granting in part Defendants' motion for summary judgment and denying

Plaintiffs' motion for summary judgment [Doc. 453].  Crescent filed a response in opposition to

the motion for revision [Doc. 463], and YEI filed a reply [Doc. 464].  This matter is now ripe.

For the reasons stated below, YEI's motion will be **GRANTED IN PART and DENIED**

**IN PART**.  The Court's previous summary judgment order will be **VACATED IN PART** to the

extent it dismissed Plaintiffs' claims arising after April 22, 2015, and to the extent it dismissed

Plaintiffs' trade secret claims and Defendants' trade secret counterclaims.  The post-April 22, 2015

---

[1] Plaintiff Robert H. Yoe, III ("Yoe") and YEI are collectively referred to as "Plaintiffs."
Defendants Crescent Sock Company ("Crescent"), Omni Wool, LLC ("Omni Wool"), Catherine
Burn Allen ("Allen"), and Sandra Burn Boyd ("Boyd") are collectively referred to as
"Defendants."

claims and the trade secret claims will be **REINSTATED**. Further, the Court will set a new schedule, including a status conference.

## I.     BACKGROUND

As detailed in many prior filings, this case arises out of a soured business relationship between Defendants and Plaintiffs. Crescent is a sock manufacturing company. Plaintiff Yoe was hired in 2000 to serve as Chief Executive Officer and Chief Financial Officer of Crescent. Defendants Allen and Boyd are part owners of Crescent, and have worked there throughout their adult lives.[2] They are members of the Burn family, which has owned and controlled Crescent since it began operations in the early 1900s. Yoe owns YEI, which holds intellectual property rights to sock brands developed by Yoe and manufactured by Crescent during Yoe's employment at Crescent, including the FITS and Game Knits brands at issue in this case.

In September 2012, Crescent and YEI entered into an agreement (the "Business Agreement") which memorialized prior agreements and the parties' business relationship in relevant part as follows:

1.  Ownership of Intellectual Property. Any and all new brands, and other intellectual property relating to such new brands, that are developed, registered, trademarked, invented, started, conceived or designed by Crescent, Yoe and/or YEI from January 1, 2009 through the termination of Yoe's employment with Crescent ('the Intellectual Property') shall be 100% owned by YEI. . . .

2.  Royalties as to "Fits" and "Jack's" Brands. Crescent shall pay royalty payments to YEI relative to the "Fits" brand . . . [at a rate of $1.00 in 2013 and 2014, and beginning in 2015 and each year thereafter at a rate of] "5% of Net Sales"; and

---

[2] Defendant Omni Wool is a company that appears to be owned by or affiliated with Defendants. Plaintiffs allege in this case that Omni Wool and/or Crescent have wrongfully used YEI's intellectual property (specifically related to FITS socks) to create and sell socks under the brand names "Omni Wool Tactical" and "Hiwassee Trading Company." [Doc. 201 at Page ID # 2894-97].

3.  Licensing.  On or before 1 year after the execution of [the Business Agreement], YEI and Crescent will enter into an agreement for licensing/manufacturing/sourcing relative to the Intellectual Property which includes terms and conditions similar to the LIG contract [and which incorporates the royalty payment schedule].

[Business Agreement, Doc. 24-3, at Page ID # 110-11].  The Business Agreement is also at least part of the parties' licensing agreement, although the parties dispute whether there are additional terms to the licensing agreement not expressly written in the Business Agreement.

Yoe and five other Crescent employees who worked with the FITS brand were fired by Crescent on September 4, 2013.  The day before, Crescent had filed a lawsuit in the McMinn County, Tennessee, Chancery Court (the "Chancery Court Case"), seeking a declaration that certain employment contracts between Yoe and Crescent (which provided for, among other things, a $2 million severance payment to Yoe upon termination without cause) and the Business Agreement were void and unenforceable.  Yoe and YEI filed counterclaims and amended counterclaims in the Chancery Court Case, alleging, *inter alia*, that Crescent breached the Business Agreement with YEI, and that:

> 22.    Upon information and belief, since terminating Mr. Yoe, Crescent has eliminated certain SKUs of FITS® product[s], changed the names of certain FITS® products, changed the packaging of products, ceased research and development of the FITS® products, is failing to use pre-existing marketing practices including but not limited to preseason terms and conditions, sales collateral, and other sales support, is failing to maintain the proper levels of FITS® product[s] in the retail stores and proper inventory levels at Crescent, and is representing that Crescent is the owner of the FITS® brand.  Each of these actions is causing irreparable damages to the FITS® bran[d] to Yoe Enterprises as owner of the FITS® brand and to Mr. Yoe as the CEO of Yoe Enterprises.

[*See* Doc. 453 at Page ID # 15551-52; Doc. 24-4 at Page ID # 221].  Plaintiffs also obtained an injunction that provided, in relevant part:

3

It appearing to the Court that the parties to this cause have agreed on the terms of the Temporary Injunction, that because of the uniqueness of the brand of sock known as FITS®, and because the value of this brand of sock may be compromised and/or lost if this injunction is not granted, it is hereby:

**ORDERED, ADJUDGED AND DECREED** that:

1.      Crescent Sock Company, its agents, employees, successors, officers and directors, and all other persons in concert or participation with such entities, are enjoined from marketing the FITS® brand products . . . unless each and every product has been manufactured using the proper materials, proper packaging, proper technology for manufacturing FITS®, proper manufacturing processes, and using all of the same specifications required to manufacture FITS® that were in place as of August 15, 2013 and using all of the same specifications as required by the patents held by Yoe Enterprises.

2.      Crescent Sock Company, its agents, employees, successors, attorneys, officers and directors and all other entities in active concert or participation with such entities, are hereby enjoined and required to fulfill any and all orders for FITS® and Jacks® products in a timely and appropriate manner, all as required by orders for such products, to the extent that said orders do not exceed the operating capacity of the Company as it existed on September 4, 2013, using the correct and proper materials, packaging, technology, manufacturing specifications and specifications as set forth above. Further, the Company shall use its best faith efforts to maintain adequate levels of inventory and yarn on order and on hand to fulfill such orders. . . .

[Doc. 24-7 at Page ID # 272-73].

The Court detailed the history of the Chancery Court Case in its summary judgment order

[Doc. 453 at Page ID 15547-56] and will not repeat it herein.  In that summary judgment order,

the Court denied Defendants' motion for summary judgment on a number of issues, but granted

summary judgment to Defendants on all Plaintiffs' claims that related specifically and exclusively

to Defendants' production of the FITS brand socks (the "FITS Claims"[3]) [Doc. 453 at Page ID # 15571]. The Court concluded that in light of the nature of the amended counterclaims and the injunction in the Chancery Court Case, the FITS Claims were barred in this case by application of res judicata. As Plaintiffs' motion for partial summary judgment related only to their FITS trademark claims, the Court also denied Plaintiffs' motion on the grounds that such claims were barred by res judicata. The Court additionally granted summary judgment to Defendants Boyd and Allen on Plaintiffs' Count XIII (Boyd and Allen's inducement of breach of the Business Agreement) on res judicata grounds. This Count is also part of the FITS Claims, but the Court addressed it separately in the summary judgment order. The Court will refer to it as being part of the FITS Claims in this Order, except where necessary to address it separately.

Finally, there are FITS-only trade secret claims. The Court held that Count VII (injunctive relief – trade secrets), which concerned only FITS, was barred by res judicata. The Court found that the declaratory relief Plaintiffs seek in Counts VI (declaratory judgment – trade secrets) and XVI (trade secret misappropriation and unfair competition – Omni Wool Tactical and Hiwassee Trading Company Socks), was moot to the extent it concerned trade secrets that relate only to FITS socks [Doc. 453 at Page ID # 15571]. To the extent Plaintiffs seek monetary damages, costs or fees concerning Defendants' alleged use or misuse of the FITS-only trade secrets in Counts VI and XVI, the Court found that res judicata applied. The Court will address the FITS-only trade secret claims separately in this order.

---

[3] "FITS Claims" include Counts I (trademark infringement against Crescent), Count II (trademark infringement against Boyd and Allen), Count V (violation of the Lanham Act), Count VIII (unfair or deceptive trade practices under Tennessee Code Annotated § 47-18-101 et seq.), Count X (unfair competition), and Count XI (breach of the license agreement) to the extent these claims relate to FITS socks only but not to the extent these claims relate to Game Knits or the Omni Wool Tactical and Hiwassee Trading Company claims.

## II.     STANDARDS

### A.     Federal Rule of Civil Procedure 54(b)

In the instant motion, Plaintiffs ask the Court to reconsider and revise its decision regarding res judicata pursuant to Federal Rule of Civil Procedure 54(b), which provides:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

"District courts have authority under both common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 Fed. App'x 949, 959 (6th Cir. 2004) (citation omitted). "Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Id.* (citation omitted). The standard "obviously vests significant discretion in district courts," *id.* at 959 n.7, and "allows district courts to afford such relief from interlocutory orders as justice requires." *Id.* (internal brackets, quotation marks and citations omitted). Nevertheless, motions to reconsider should be "used sparingly and in rare circumstances." *Grogg v. Clark*, No. 2:15-CV-298-JRG-MCLC, 2016 WL 1394534, at *1 (E.D. Tenn. Apr. 7, 2016).

### B.     Summary Judgment

Summary judgment is mandatory where "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that *matters*—i.e., a fact that, if found to be true, might "affect the outcome" of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The applicable

substantive law provides the frame of reference to determine which facts are material. *Id.* A "genuine" dispute exists with respect to a material fact when the evidence would enable a reasonable jury to find for the non-moving party. *Id.*; *Jones v. Sandusky Cnty., Ohio*, 541 F. App'x 653, 659 (6th Cir. 2013); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). In determining whether a dispute is "genuine," the court cannot weigh the evidence or determine the truth of any matter in dispute. *Anderson*, 477 U.S. at 249. Instead, the court must view the facts and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports*, 253 F.3d at 907.

The moving party bears the initial burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jones*, 541 F. App'x at 659. To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Celotex*, 477 U.S. at 323. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248, 249; *Nat'l Satellite Sports*, 253 F.3d at 907.

To defeat a plaintiff's claim using an affirmative defense such as res judicata on summary judgment, a defendant must meet a "substantially higher hurdle" than both the preponderance-of-the-evidence standard a defendant would have to meet at trial and the typical summary-judgment standard. *Cockrel v. Shelby Ct. School Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). Only after a moving defendant has discharged the initial burden of proof "does the burden shift to the plaintiff to show that summary judgment on an affirmative defense should be denied." *Byrne v. CSX*

*Transp., Inc.*, 541 F. App'x 672, 675 (6th Cir. 2013). A moving defendant "must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Id.* (quoting 11 James William Moore *et al.*, *Moore's Federal Practice* § 56.13[1], at 56–138 (3d ed. 2000)). The court "must view the evidence and draw all inferences in the light most favorable to the nonmoving party, and '[s]ummary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact.'" *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)) (alterations in original).

## III. ANALYSIS

YEI contends that the Court erred in finding the FITS Claims were part of the same series of transactions, in terms of their subject matter, that were adjudicated in the Chancery Court Case [Doc. 459 at Page ID # 15617-19; Doc. 464 at Page ID # 15720-21]. YEI also contends that the Court erred in dismissing on res judicata grounds any claims that arose after entry of judgment in the Chancery Court Case in December 2014[4] [Doc. 459 at Page ID # 15606-17; Doc. 464 at Page ID # 15713-29].

---

[4] YEI argued in its opening brief that a bright-line rule applied to bar any claims arising after commencement of the Chancery Court Case on September 3, 2013 [Doc. 459 at Page ID # 15603-04, 15614]. On this issue in the reply brief, YEI mainly argues that its claims arising "after the state court rendered its judgment on December 23, 2014, or after its entry on December 29, 2014, are not subject to res judicata." [Doc. 464 at Page ID # 15713; *see also id.* at Page ID # 15722 ("[A]ny claims accruing after the trial court's rendered judgment could not be barred . . . ."); *id.* at Page ID # 15724 ("The language adopted by *Creech*—that claim preclusion can extend only to the facts in issue as they existed at the time the judgment was rendered—and its application, leads to the most practical result.")].

After careful consideration, the Court finds it necessary to revise the summary judgment order. Plaintiffs' FITS Claims, including any inducement of breach of contract claims against Boyd and Allen, arising after entry of the "Order Regarding Post Trial Motions" in the Chancery Court Case on April 22, 2015, are not barred by application of the doctrine of res judicata. Based on YEI's representations concerning the FITS-only trade secret claims (addressed below), the Court finds that the FITS-only trade secret claims should be reinstated in their entirety. The Court further finds, however, that YEI has failed to show clear error in the Court's conclusion that any FITS Claim, including inducement of breach of contract claims against Boyd and Allen, arising on or before April 22, 2015, are barred. It is undisputed that Crescent stopped manufacturing FITS socks on February 28, 2016 [Doc. 377-6 at Page ID # 10872]. As a result, the Court's holding reinstates Plaintiffs' FITS Claims, including the inducement of breach of contract claims, arising between April 22, 2015, and February 28, 2016. In correcting this error, the Court notes that the issue of when the continuing claims arose vis-à-vis entry of the Chancery Court Case "final judgment" was only raised in passing, at best, in the Plaintiffs' response to Defendants' motion for summary judgment [Doc. 382 at Page ID # 10991-92]. Regardless, Rule 54 provides a vehicle for correction.

## A. Res Judicata

As the Court explained in the summary judgment order, "[s]tate-court judgments are given the same preclusive effect under the doctrine of res judicata . . . as they would receive in courts of the rendering state." *Ohio ex rel. Boggs v. City of Cleveland*, 655 F.3d 516, 519 (6th Cir. 2011). "If an individual is precluded from litigating the suit in state court by the traditional principles of res judicata, he is similarly precluded from litigating the suit in federal court." *Id.* (internal quotation marks and citations omitted). The Court must "look to the state's law to assess the

preclusive effect it would attach to that judgment." *Id.* (internal quotation marks and citations omitted). While YEI suggests that federal law on res judicata should apply in this case [Doc. 464 at Page ID # 15715-17], the Court is required to apply Tennessee's law on res judicata. *Id.* There is some overlap, but also some significant distinctions, between the two.

In Tennessee, "[t]he doctrine of res judicata or claim preclusion bars a second suit between the same parties or their privies on the same claim with respect to all issues which were, or could have been, litigated in the former suit." *Jackson v. Smith*, 387 S.W.3d 486, 491 (Tenn. 2012) (citations omitted). "Res judicata acts as a 'rule of rest' meant to promote finality, prevent inconsistent or contradictory judgments, conserve resources, and prevent vexatious lawsuits." *Rainbow Ridge Resort, LLC v. BB&T Co.*, 525 S.W.3d 252, 259 (Tenn. Ct. App. 2016) (internal quotation marks and citations omitted). There are four elements to res judicata: (1) a previous action before a court of competent jurisdiction, (2) involving the same parties or their privies, (3) involving the same cause of action, and (4) resulting in a final judgment on the merits. *Id.* (internal quotation marks and citations omitted). "The doctrine of res judicata only requires that there be a full and fair *opportunity* to litigate all issues arising out of the claim, however, every applicable issue need not be actually litigated in order for res judicata to apply." *Gerber v. Holcomb*, 219 S.W.3d 914, 918 (Tenn. Ct. App. 2006) (internal quotation marks, citations, and italics omitted).

Two suits are deemed the "same 'cause of action' for purposes of res judicata where they arise out of the same transaction or a series of connected transactions." *Creech v. Addington*, 281 S.W.3d 363, 381 (Tenn. 2009) (citations omitted). "The doctrine of res judicata 'extends only to the facts in issue as they existed at the time the judgment was rendered, and does not prevent a re-examination of the same question between the same parties where in the interval the facts have

changed or new facts have occurred which may alter the legal rights or relations of the litigants.'" *Id.* (quoting *Banks v. Banks*, 77 S.W.2d 74, 76 (Tenn. Ct. App. 1934)).

Plaintiffs argue that none of the FITS Claims are barred because the FITS Claims arose out of a different series of transactions than the claims at issue in the Chancery Court Case, in the sense that the subject matter of the claims is different. They also argue that, even if earlier FITS Claims and inducement of breach of contract claims are part of the same series of transactions, no claims based on Defendants' alleged continuing infringement and other wrongful actions after the chancery court "rendered" judgment on December 23, 2014, can be barred. The Court will deal with the subject matter arguments first, and then address the point at which the chancery court's judgment became "final," therefore creating a preclusive effect.

### B. Same Transaction or Occurrence – Subject Matter of Chancery Court Case

"'[T]ransaction' for res judicata purposes is intended to be analogous to the phrase 'transaction or occurrence' as used in the Federal Rules of Civil Procedure." *Creech*, 281 S.W.3d at 380 (citing, *inter alia*, Fed. R. Civ. P. 13(a)(1) (determining whether counterclaims are compulsory)). Courts use a "logical relationship test to determine whether claims arise out of the same transaction or series of transactions. *Roberts v. Vaughn*, No. W2008-01126-COA-R3-CV, 2009 WL 1608981, at *7 (Tenn. Ct. App. June 10, 2009) (quoting *Sanders v. First Nat'l Bank & Trust Co. in Great Bend*, 936 F.2d 273, 277 (6th Cir. 1991)). Under this approach, courts are to "look to the issues of law and facts raised by the claims to see if they are largely the same." *Suddarth v. Household Comm. Fin. Servs., Inc.*, No. M2004-01664-COA-R3-CV, 2006 WL 334031, at *3-4 (Tenn. Ct. App. Feb. 13, 2006) (holding that claims are barred where "the former action arose out of the same business relationship between the [parties] at issue in the present

action, and specifically out of the guaranty agreement sued on in the former action") (citing *Sanders*, 936 F.2d at 277).

The Court found that Plaintiffs' FITS Claims were part of the same series of transactions that were the subject of Plaintiffs' Chancery Court Case counterclaims and the injunction, that is, claims arising from the disintegration of the parties' business relationship, and the division and protection of the FITS brand in the wake of Yoe's termination from Crescent. The FITS Claims in the third amended complaint in this case are largely if not entirely predicated on the idea that after Yoe was fired, Crescent exercised control over the FITS brand. This included making changes to the design of FITS socks and their branding or marketing, and representing that Crescent was the owner of FITS, when the true owner of the brand was actually YEI. Plaintiffs claim this caused damage to Plaintiffs and to the brand more generally. In previously dismissing the FITS Claims on Defendants' motion for summary judgment, the Court reasoned:

> It is clear from Yoe and YEI's pleadings in the Chancery Court Case, in particular the January 2014 amended counterclaim and third-party complaint detailed above, that the allegedly infringing/unfair conduct with respect to FITS was occurring or had already occurred prior to the expiration of the injunction. The Court therefore rejects Yoe and YEI's characterization of the Chancery Court Case as having a "singular" purpose of "invalidat[ing] the contracts that gave YEI ownership of FITS and Bob Yoe a severance package," and as "deal[ing] with matters that existed before September 3, 2013, when Crescent sued Yoe." [Doc. 382 at Page ID # 10990-91]. The existence of the injunction, which is by nature forward looking, belies Yoe and YEI's characterization, as do the allegations in Yoe and YEI's January 2014 amended countercomplaint and third-party complaint in the Chancery Court Case:
>
> > 22. Upon information and belief, since terminating Mr. Yoe, Crescent has eliminated certain SKUs of FITS® product[s], changed the names of certain FITS® products, changed the packaging of products, ceased research and development of the FITS® products, is failing to use pre-existing

> marketing practices including but not limited to preseason terms and conditions, sales collateral, and other sales support, is failing to maintain the proper levels of FITS® product[s] in the retail stores and proper inventory levels at Crescent, and is representing that Crescent is the owner of the FITS® brand. Each of these actions is causing irreparable damages to the FITS® bran[d] to Yoe Enterprises as owner of the FITS® brand and to Mr. Yoe as the CEO of Yoe Enterprises.

> [Doc. 24-4 at Page ID # 221]. These assertions, along with the injunction, effectively expanded the scope of the lawsuit to include events and interactions between the parties that occurred after the filing of the initial chancery court complaint. The alleged acts of infringement, unfair competition, etc. [asserted in the federal court case], arise out of the same series of transactions that necessitated the injunction in the first place—once again, the disintegration of the parties' business relationship, and the division and protection of the FITS brand in the wake of Yoe's termination from Crescent.

[Doc. 453 at Page ID # 15567-68]. These same allegations form the basis for Plaintiffs' FITS

Claims in the third amended complaint [Doc. 201]. The following are relevant excerpts from the

third amended complaint:

- Count I – Federal Trademark Infringement – Crescent: "Without authorization or approval by YEI, [Crescent] has utilized the marks in connection with goods and products which have not been approved by YEI. Such unauthorized conduct includes, among other things, advertising, selling and marketing socks not manufactured pursuant to YEI's specifications or quality standards with the YEI Trademarks. In addition, Crescent has used advertising and other materials which display the YEI Trademarks which have not been approved or authorized by YEI." [Doc. 201 at Page ID # 2881].

- Count II – Federal Trademark Infringement – Individual Defendants: "The individual Defendants have personally authorized and/or taken part in the infringing activities of Crescent and/or have specifically directed its employees to do so. The individual Defendants are central figures in the infringements who have authorized and approved the activities of Crescent described herein for their personal gain." [*id.* at Page ID # 2882].

- Count V – Violation of the Lanham Act, 15 U.S.C. § 1125(a): Crescent's "actions are designed to and are likely to confuse buyers and others in the chain of marketing and distribution into believing that those goods are authorized by YEI, are of the

quality with which socks manufactured according to YEI's specifications are associated, and to confuse potential buyers and others as to the sources and quality of the goods." [*id.* at Page ID # 2884].

- Count VI – Declaratory Judgment – Trade Secrets[5]: "[T]he proprietary processes, patterns, methods, and techniques developed by Yoe are trade secrets belonging to YEI. . . . Crescent has represented that it owns, controls, and has the right to use without limitation YEI's trade secrets." [*id.* at Page ID # 2884-85].

- Count VII – Injunctive Relief – Trade Secrets: "Crescent has misused YEI's trade secrets, has used them without authorization from YEI, and has impermissibly used them to manufacture socks not approved by YEI. The products Crescent has impermissibly manufactured with the Trade Secrets are inferior to authorized YEI products and cause damage to YEI's brands. Crescent will continue to impermissibly use the Trade Secrets unless enjoined by the Court." [*id.* at Page ID # 2886-87].

- Count VIII – Unfair or Deceptive Trade Practices Under Tennessee Code Annotated § 47-18-101 et seq.: "Defendants have . . . engaged in unfair and deceptive acts and practices, including . . . falsely passing off their goods as those of YEI . . . ." [*id.* at Page ID # 2888].

- Count X – Unfair Competition: "Because Crescent has used, without YEI's authorization, its marks and represented to the public that FITS® . . . brand socks are products consistent with the reputation which the public associates with YEI's marks; and has sold inferior products using, without authorization, YEI's marks; and has used the YEI Trademarks without YEI's authorization, it is competing and has competed unfairly with YEI in violation of Tennessee law." [*id.* at Page ID # 2889].

- Count XI – Breach of License Agreement: "Crescent's actions in terminating Mr. Yoe, in failing to properly and prudently manufacture, market and promote the FITS® brand under Mr. Yoe's direction, in eliminating SKUs, changing the name and packaging of FITS® products, ceasing R & D of the FITS® products, failing to use pre-existing marketing practices approved by YEI, and in marketing, manufacturing and promoting the FITS® products in a manner unacceptable to and unapproved by YEI, the owner of the FITS® brand, and the conduct listed in

---

[5] The Court notes that it dismissed Count VI – Declaratory Judgment – Trade Secrets as moot, and found that any monetary damages Plaintiffs sought under that count were barred by res judicata [Doc. 453 at Page ID # 15571-72].

Paragraphs 32 and 35[6] of this Complaint, constitute a violation and breach of [the Business Agreement and Yoe's employment contracts]." [*id.* at Page ID # 2890].

- Count XIII – Defendants Allen and Boyd's Inducement of Breach of Contract (YEI): "Defendants directed and caused Crescent to file suit seeking to declare the Business Agreement void as to Mr. Yoe and YEI and to exercise complete and deliberate control over the YEI brands and the Intellectual Property. . . . Defendant Allen and Boyd's actions . . . constituted an intentional and unjustified inducement of a breach of the contractual relationship between Crescent and YEI." [Doc. 201 at Page ID # 2892].

Plaintiffs are alleging legal theories in this case which they did not assert or did not pursue to final judgment in the Chancery Court Case, but whether Defendants breached the Business Agreement (which is at least part of the licensing agreement) was clearly at issue in the Chancery Court Case. Indeed, the chancery court held that "YEI is the owner of the respected brands in question, and by Crescent now claiming ownership of the brands, Crescent has in fact breached the [Business Agreement] . . . ." [Doc. 382-3 at Page ID #11115]. The chancery court also held that the filing of the Chancery Court Case did not, in and of itself, constitute a breach of the Business Agreement [Doc. 56-1 at Page ID # 617-18]. Moreover, whether Defendants were properly producing FITS during the time period following Yoe's termination was clearly at issue in the Chancery Court Case, as evidenced by Plaintiffs' allegations concerning Defendants' changing SKUs, changing marketing practices, etc., and also as evidenced by the chancery court injunction. Finally, the Business Agreement is an integral component of the parties' licensing

---

[6] Paragraph 32 of the third amended complaint describes how the individual Defendants owned warehouses which they leased to Crescent for "substantial lease payments," and their own personal gain. It states that "[i]f a plan advocated by Mr. Yoe to build Crescent's own warehouse and terminate the leases . . . were implemented, Defendants Allen and Boyd . . . would no longer receive the lease payments and suffer personally." [Doc. 201 at Page ID # 2876]. Paragraph 35 simply states that "Crescent has failed and refused to abide by the terms of the Business Agreement, asserting that its terms are not binding upon [Crescent]." [*id.* at Page ID # 2877].

agreement. Defendants contend the Business Agreement defines the entire scope of the licensing agreement; Plaintiffs contend there are additional "terms" or rights that YEI held.

What the Court is confronted with in this case, versus the Chancery Court Case, are essentially claims for different types of breaches of the same contract (the Business Agreement, an integral component of the parties' licensing agreement), by the same parties, arising from conduct that was specifically prohibited by an injunction that was repeatedly affirmed in the Chancery Court Case. In both cases, Plaintiffs have asserted Defendants breached the Business Agreement, and therefore the licensing agreement. The specifications of FITS socks were at issue via the injunction and other allegations made by Plaintiffs in the Chancery Court Case, and they are at issue in this case through a host of claims as quoted above. In spite of the non-suit of certain claims, the injunction itself is a form of relief concerning Defendants' production of FITS in the wake of Yoe's termination.

In addition, the Court found that Plaintiffs' claim in this case for inducement of breach of contract against Boyd and Allen (Count XIII) was barred because: 1) it is based on Boyd and Allen's alleged inducement of Crescent's breach of the Business Agreement, with the breach being the filing the Chancery Court Case and the subsequent exercise of control over FITS without Yoe's input; 2) Crescent's breach of the Business Agreement was clearly part of the Chancery Court Case; 3) the injunction in the Chancery Court Case was directed to Boyd and Allen as employees and officers of Crescent; 4) Boyd and Allen were parties to the Chancery Court Case; and 5) it is beyond serious dispute that Boyd and Allen were at least partially, if not mostly, in control of Crescent at all relevant times [Doc. 453 at Page ID # 15565-66]. Clearly, the parties were litigating facts in the Chancery Court Case that would have strongly overlapped with any claim that Boyd and Allen induced Crescent's breach of the Business Agreement.

In support of their position that the Court's decision that the FITS Claims are not part of the same transaction or occurrence, Plaintiffs rely most heavily on *Acumed, LLC v. Stryker Corp.*, 525 F.3d 1319 (Fed. Cir. 2008) [Doc. 459 at Page ID # 15618[7]].  In that case, Acumed first sued Stryker for patent infringement relating to a type of medical nail used to repair bone fractures. Stryker called its nail the T2 PHN.  During the course of the T2 PHN litigation, Acumed discovered that Stryker had allegedly used the same patent to make a second, longer type of nail, the T2 Long. *Acumed*, 525 F.3d at 1322.  The trial court offered to allow Acumed to amend its T2 PHN complaint to include allegations that the T2 Long infringed on the patent, but warned that the amendment would delay the trial by up to one year.  Acumed opted to proceed to trial on the T2 PHN nail infringement claims, and then later filed a completely separate action on the T2 Long. The trial court in the second suit dismissed Acumed's claim on the T2 Long on claim preclusion (res judicata) grounds.  *Id.*  On appeal of the dismissal of the second suit, the only issue was whether the cases involved "the same claim or cause of action."  *Id.* at 1323 (internal quotation marks and citation omitted).

The United States Court of Appeals for the Federal Circuit found that "[w]hether two claims for patent infringement are identical is a claim preclusion issue that is 'particular to patent law,'" and therefore must be analyzed "under Federal Circuit law."  *Id.* (quoting *Hallco Mfg. Co. v. Foster*, 256 F.3d 1290, 1294 (Fed. Cir. 2001)) (other citation omission).  The court cited earlier Federal Circuit precedent which specifically held that "[w]ith respect to patent litigation, we are unpersuaded that an 'infringement claim,' for purposes of claim preclusion, embraces more than

---

[7] Plaintiffs write in their memorandum in support of their motion to revise, "[a] more stark contrast between what this Court has decided and what other courts have decided can't be better presented than in the *Acumed* case." [Doc. 459 at Page ID # 15618].

the specific devices before the court in the first suit." *Id.* at 1324 (quoting *Young Eng'rs, Inc. v. United States Int'l Trade Comm'n*, 721 F.2d 1305, 1316 (Fed. Cir. 1984) (other citation omitted). The court thus found that "claim preclusion does *not* apply unless the accused device in the action before the court is 'essentially the same' as the accused device in a prior action between the parties that was resolved on the merits." *Id.* (citation omitted). Ultimately, the court concluded that the structure of the T2 PHN and T2 Long was not "essentially the same," and therefore res judicata did not apply.

Here, the issues of claim preclusion, or res judicata, are not so narrow nor are they governed by federal law. The claims, allegations, and relief Plaintiffs have pursued and continue to pursue in these two cases are broader than the issues in *Acumed*, and therefore the application of claim preclusion (res judicata) is also broader. For example, Plaintiffs' Count I alleges that Crescent "has utilized the [trade]marks in connection with goods and products which have not been approved by YEI." [Doc. 201 at Page ID # 2881]. Plaintiffs' theory is that all FITS socks had to be approved by Yoe before they could be sold, which Defendants dispute. That fundamental issue, and any claims for relief that flow from its resolution (and which arose prior to April 22, 2015), could have and should have been raised in the Chancery Court Case. As discussed below, however, the Court now finds that any unapproved changes that occurred after April 22, 2015, gave rise to a new cause of action, and therefore a new opportunity for Plaintiffs to make this argument, and to seek damages for any post-April 22, 2015, conduct.

Finally, the Court was careful to exclude from its res judicata holding any claims involving allegations that Defendants misappropriated Plaintiffs' intellectual property in FITS by incorporating it into the Hiwassee Trade Company or Omni Wool socks. For these reasons, *Acumed* is distinguishable.

Plaintiffs also rely on *Grendene USA, Inc. v. Brady*, No. 3:14-cv-2955-GPC-KSC, 2015 WL 1499229 (S.D. Cal. Apr. 1, 2015).  In that case, the Bradys had filed a trademark infringement action against Grendene on March 9, 2012.  Grendene then sued the Bradys on December 15, 2014, arguing the filing of the trademark suit constituted a breach of a 1995 settlement agreement that contained a covenant not to sue.  *Id.* at *1.  The Bradys argued in the later suit that Grendene's breach of contract claim should be dismissed because it was a compulsory counterclaim in the earlier trademark infringement case.  The court denied the motion to dismiss, finding in relevant part that:

> In determining whether a counterclaim is compulsory, the Ninth Circuit applies the "logical relationship test" which analyzes whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all issues be resolved in one lawsuit.  Applying the logical relationship test, the "essential facts" of the Bradys' causes of action in the Trademark Action differ from those of Grendene's breach of contract cause of action.  The Trademark Action involves facts dealing with alleged infringement.  This action involves facts dealing with the Bradys['] decision to file a lawsuit based on that alleged infringement.  These are separate facts as the decision to bring a legal cause of action is separate from the elements of that cause of action.  Accordingly, the Court finds that Grendene's breach of contract cause of action was not a compulsory counterclaim.

2015 WL 1499229, at *3 (internal quotation marks, citations and alterations omitted).  As Crescent points out, however, the court in *Grendene* offers little analysis and the decision is not binding on this Court.  Moreover, as described above, facts underlying Plaintiffs' FITS Claims *were* involved in the Chancery Court Case.  The breaches alleged by Plaintiffs in the Chancery Court Case involved actions allegedly taken by Defendants regarding FITS after Defendants filed the Chancery Court Case and terminated Yoe, not just Defendants' decision to take the action of firing Yoe.

The Court finds Plaintiffs have failed to show any clear error with the Court's prior decision that the FITS Claims are part of the same transaction or occurrence (in the subject matter sense) as the claims involved in the Chancery Court Case.

### C.   Final Judgment

YEI also argues that, even if the FITS Claims arose out of the same transaction or occurrence, any claims which arose after the date the chancery court rendered its judgment on December 23 (or the date the chancery court clerk *entered* the judgment on December 29, 2014), cannot be barred by res judicata. The Court did not discuss this issue as such in its prior summary judgment order except to note that the various amendments to and allegations in Plaintiffs' pleadings in the Chancery Court Case and the injunction expanded the scope of the lawsuit to include claims that arose after the filing of the complaint [Doc. 453 at Page ID # 15567-68].

In the pending motion, YEI originally argued that res judicata does not apply to any events occurring after the commencement of the Chancery Court Case on September 3, 2013 under a bright-line rule [Doc. 459 at Page ID # 15614. In its reply, however, YEI seems to acknowledge that Tennessee has not adopted the bright-line rule and mainly argues that FITS Claims arising from actions "occurring after the state court rendered its judgment on December 23, 2014, or after its entry on December 29, 2014, are not subject to *res judicata*." [Doc. 464 at Page ID # 15713; *see also, e.g., id.* at Page ID # 15724 ("The language adopted by *Creech*—that claim preclusion can extend only to the facts in issue as they existed at the time the judgment was rendered—and its application, leads to the most practical result.")]. As pertinent here, the issue is when the judgment became "final" such that it began to have preclusive effect.

In Tennessee, a judgment is final "when it decides and disposes of the *whole* merits of the case leaving nothing for the further judgment of the court." *Creech*, 281 S.W.3d at 377 (quoting

*Richardson v. Tenn. Bd. of Dentistry*, 913 S.W.2d 446, 460 (Tenn. 1995)). "In the absence of an express direction of the court to the contrary, a judgment that disposes of only some of the claims, issues, or parties is not a final judgment adjudicating all claims and the rights and liabilities of all parties." *Id.* (citations omitted).[8] In *Creech*, the Tennessee Supreme Court explained that "a judgment is not final and *res judicata* where an appeal is pending." *Creech*, 281 S.W.3d at 377-78 (quoting *McBurney v. Aldrich*, 816 S.W.2d 30, 34 (Tenn. Ct. App. 1991)) (citing *Freeman v. Marco Transp. Co.*, 27 S.W.3d 909, 913 (Tenn. 2000)); *see also Brown v. Burch, Porter, & Johnson PLLC Law Firm*, No. 15-2167, 2015 WL 5737802, at *5 (W.D. Tenn. Sept. 30, 2015) ("Unlike federal law, under Tennessee law a judgment is not final for purposes of res judicata where an appeal is pending." (internal quotation marks, alteration, and citations omitted)). "[T]his general rule places Tennessee in the minority of jurisdictions. The federal courts and the majority of states have found '[t]he better view,' to be that taking of an appeal does not affect the finality of a judgment for res judicata purposes." *Creech*, 281 S.W.3d at 377 n.17 (quoting Restatement (Second) of Judgments § 13 cmt. f) (other citations omitted).

*Creech* is a procedurally and factually complicated case involving a failed casino/real estate development project. The trial court in *Creech* entered a judgment as to some of the

---

[8] On October 31, 2017, the Court granted Crescent leave to file an amended answer to assert the affirmative defense of res judicata over Plaintiffs' objections [Doc. 406]. Crescent claims it waited to assert the res judicata defense until after the Chancery Court Case appeal had been resolved and the case remanded to the chancery court to correct an issue concerning attorney's fees, which the parties eventually resolved by agreement, with the "final order" entered by the chancery court on August 23, 2017 [Doc. 300-4]. The Court found that because the "final order" was not entered until August 2017, Crescent acted diligently enough and satisfied the applicable requirements of Federal Rules of Civil Procedure 15 and 16, even though Crescent sought leave to amend until almost a year after the deadline for amendments, and over a year after the Tennessee Court of Appeals entered its order largely affirming the chancery court's findings [Doc. 406 at Page ID # 11459-61]. It suffices to note here that the question of whether the Court should allow a party to amend its pleadings to assert a defense of res judicata is different from the question of whether claims are barred by res judicata.

defendants, including real estate agents Betty and Lloyd Link (the "Links"), in 1998. The judgment as to the last defendant was not entered until January 2, 2003. *Id.* at 370. The plaintiffs appealed the dismissal of certain defendants (landowners Parker and Flowers), and the Tennessee Court of Appeals remanded for further proceedings. *Id.* at 370-71. As it turned out, the liability of Parker and Flowers depended on whether the Links could be held liable as the agents of Parker and Flowers. *Id.* Because the plaintiffs had not appealed the original dismissal of the Links, the judgment against the Links became final on February 1, 2003 (thirty days after the order resolving the claims as to the last defendant). *Id.* at 377. The plaintiffs discovered additional allegations involving the Links, which arose from the same failed development project, in September 2000, but did not assert any claims against Parker and Flowers related to these allegations until 2005, after the court of appeals remanded the case against Parker and Flowers. *Id.* at 375. On remand, Parker and Flowers argued that the plaintiffs' new claims involving the allegations against the Links were barred, but the trial court disagreed and conducted a trial against Parker and Flowers. Ultimately, the Tennessee Supreme Court found the trial court decided the res judicata issue wrongly. Even though the plaintiffs did not discover the additional claims against the Links until *after* the Links had been dismissed from the case (in 1998), the supreme court held that the plaintiffs "had the opportunity to fully and fairly litigate the fraudulent misrepresentation claims against the Links before the finality of the judgment" on February 1, 2003. *Id.* at 382. The court reasoned that the plaintiffs could have amended their complaint to allege the fraudulent misrepresentation claims against the Links (even after the Links had been dismissed from the case), or appealed the original dismissal of the Links. *Id.* at 382-83.

*Creech* clearly states that a judgment pending on appeal is not final and does not have preclusive effect; however, the claims that were barred in that case unquestionably arose prior to

22

the commencement of the case, although the plaintiffs did not discover them until much later.  *Id.* at 382-83.  Moreover, the plaintiffs in that case discovered the relevant claims against the Links before the actual judgment against the Links became final, even though the Links had been dismissed years prior.  The *Creech* court also noted that "[t]here are a number of circumstances in which a second action by a plaintiff against the same defendant might be necessary and appropriate even though the second suit arises out of the same transaction or series of connected transactions as the first suit," for example "when a plaintiff is initially unaware of the existence of a cause of action due to the defendants' own concealment or misrepresentation."  *Id.* at 381-82 (citing Restatement (Second) of Judgments § 26(1)[9]).

*Regions Financial Corp. v. Marsh USA, Inc.*, 310 S.W.3d 382 (Tenn. Ct. App. 2009), was decided shortly before *Creech*.  In that case, Regions argued that its claims were not barred by res judicata where they were based upon facts that allegedly had been concealed by a group of defendants referred to as the "Excess Insurers."  *Id.* at 386.  Regions had filed a federal court case against the Excess Insurers for breach of contract, and appealed that case to the Sixth Circuit.  While that case was on appeal, Regions discovered facts that "occurred before it filed suit in District Court but which [Regions] claims it had not discovered until it appealed to the Sixth Circuit."  *Id.* at 394.  Regions then filed the state court case asserting similar claims as in the federal court case, but which were based on the new facts.  *Id.* at 389-90.  The state trial court dismissed Regions's claims on res judicata grounds.  *Id.* at 389.  The trial court rejected Regions's argument

---

[9] Another circumstance listed in the Restatement, although not discussed in *Creech*, is "[f]or reasons of substantive policy in a case involving a continuing or recurrent wrong, the plaintiff is given an option to sue once for the total harm, both past and prospective, or to sue from time to time for the damages incurred to the date of suit, and chooses the latter course."  Restatement (Second) of Judgments § 26(1)(e).

that Regions could not have relied on these facts in the earlier federal court case because the facts had allegedly been concealed until "several months after the District Court disposed of the parties' post-trial motions and after Regions had filed its appeal to the Sixth Circuit." *Id.* at 394. The trial court held that the relevant facts were "known before the [Sixth Circuit] ruled and there was plenty of time to raise or present those facts to either the District Court or the [Sixth Circuit]." *Id.* (quoting trial court's holding). The trial court found that Regions could have raised the new claims in the federal court through a Federal Rule of Civil Procedure 60(b) motion, and the Tennessee Court of Appeals affirmed. *Id.* at 394-95.

Like *Creech*, the difference between *Regions* and this case is that Plaintiffs allege a number of claims which are based on actions that allegedly occurred not only after the filing of the chancery court complaint, but also after the amended counterclaims, the chancery court trial, and even after the chancery court ruled on the post-trial motions in April 2015. The court in *Regions* emphasized that:

> [w]e must be careful to distinguish between a "change in facts" or "new facts [which] have occurred after the original judgment" and "newly discovered evidence." Newly discovered evidence is simply evidence of facts as they existed at the time of the original trial and cannot be said to be a "change in facts" or "new facts."

*Regions*, 310 S.W.3d at 394 (quoting *Short v. Short*, No. 03A01-9402-CH-00065, 1994 WL 315902, at *4 (Tenn. Ct. App. 1994)). The *Regions* court found it was important to maintain this distinction because:

> [a] prior judgment or decree does not prohibit the later consideration of rights that had not accrued at the time of the earlier proceeding or the reexamination of the same question between the same parties when the facts have changed or new facts have occurred that have altered the parties' legal rights and relations.

*Id.* at 393 (quoting *Lien v. Couch*, 993 S.W.2d 53, 56 (Tenn. Ct. App. 1998)) (other citations omitted). In *Segroves v. Union Carbide*, the Tennessee Supreme Court Special Workers Compensation Appeals Panel put it this way: "any 'new facts' asserted in a second action must have occurred after the first adjudication; they do not include newly discovered evidence of facts that existed prior to the adjudication." No. E2015-00572-SC-R3-WC, 2015 WL 8483629, at *3 (Tenn. Dec. 10, 2015). In *Merwin v. Davis*, the Tennessee Court of Appeals affirmed a trial court's dismissal of claims arising prior to entry of a settlement agreement of a prior civil action; however, the court allowed claims for malicious prosecution, civil conspiracy, and breach of contract which arose after entry of the settlement, but out of the same neighbor dispute, to proceed. No. E2016-00508-COA-R3-CV, 2017 WL 935107 (Tenn. Ct. App. Mar. 9, 2017); *see also Parvin v. Newman*, 518 S.W.3d 298, 306, 311 (Tenn. Ct. App. 2016) (husband's abuse of process claim arising from wife's filing of allegedly harassing motion during divorce proceedings barred from later prosecution by entry of final divorce decree which stated that parties "had reached an agreement to settle and compromise all of the matters in dispute").

Of course, the language in *Regions* and *Segroves* discussing how claims are not barred when they are based on "new facts" which arise "after the original judgment," or when they "had not accrued at the time of the earlier proceeding," or which "have occurred after the first adjudication," begs a question mentioned earlier in this memorandum—at what point did the judgment/adjudication/decision in the Chancery Court Case become final such that it took on preclusive effect? *Creech* explicitly says a judgment on appeal is not final for res judicata purposes. *Regions* says that a party can file a post-trial Rule 60 motion to request relief on previously unasserted claims. But again, both of those cases involved claims that arose prior to commencement of the second suit (even if the claims were not discovered until later). Plaintiffs

argue that to deny them relief on their claims arising after the trial court rendered its December 23, 2014, judgment in the Chancery Court Case would "reward Crescent for its continued, unabated, wrongful conduct." [Doc. 464 at Page ID # 15729].

YEI cites federal court cases in its opening brief which hold that claims for continuing wrongs (like an ongoing trademark infringement), are not barred in a subsequent case if the claims arise after the filing of a complaint in a prior case.[10] These cases do not appear to align with the broader application of res judicata under Tennessee law, which as even YEI appears to recognize in reply, bars claims arising prior to *judgment*, not the filing of the complaint.

Keeping these principles in mind, the Court concludes that any FITS Claims, including any inducement of breach of contract claims arising after the chancery court entered (signed) the Order Regarding Post Trial Motions on April 22, 2015, are barred. Although neither party addressed the Order Regarding Post Trial Motions order in its briefing as being the relevant order, the chancery court specifically identified it as the "final order" [Doc. 56-1 at Page ID # 631]. The chancery court also found that the December 29, 2014, order "should not have been entitled Final Order because that order did in fact resolve less than all of the claims before the court, as specifically stated by the court . . . ." [*id.* at Page ID # 629].

---

[10] Plaintiffs cite *Rawe v. Liberty Mutual Fire Insurance Company,* in which the Sixth Circuit held that under *federal law*, claims which were not ripe until after the plaintiff filed her first lawsuit could not be barred in a subsequent lawsuit. 462 F.3d 521, 529 (6th Cir. 2006). *Smith v. Potter*, 513 F.3d 781 (7th Cir. 2008), also involved federal law on res judicata.

Plaintiffs also cite *Marcel Fashions Group v. Lucky Brand Dungarees, Inc.*, 779 F.3d 102, 106, 108-10 (2d Cir. 2015), in which the Second Circuit held that claims arising after entry of a prior, unappealed judgment were not barred in a subsequent suit. The Second Circuit also held in *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 502-03 (2d. Cir. 2014), that claims arising after entry of a final settlement were not barred in a subsequent suit.

While the Court recognizes the instruction in *Creech* that an order pending on appeal is not final for res judicata purposes, *Creech* also holds that "the second suit is not barred by res judicata unless the plaintiffs had the opportunity in the first suit to fully and fairly litigate the particular issue giving rise to the second suit." *Creech*, 281 S.W.3d at 382. It is not clear whether YEI had the opportunity to litigate any new claims after Crescent filed its appeal of the Order Regarding Post Trial Motions, or how Plaintiffs could have pursued any new claims in the Tennessee Court of Appeals. The only issue pending after remand from the court of appeals in May 2016 was the division of the attorney fees between YEI and Yoe. *Crescent Sock Co. v. Yoe*, No. E2015-00948-COA-R3-CV, 2016 WL 3619358, at *9 (Tenn. Ct. App. May 25, 2016). Moreover, both *Creech* and *Regions* involved claims arising prior to commencement of the preclusive suit, unlike the case at bar, where FITS Claims allegedly continued to arise until Defendants ceased production on February 28, 2016.

Finally, as Plaintiffs point out, the Tennessee Court of Appeals has recently stated that "[w]here there is any uncertainty [res judicata] does not apply." *Rainbow Ridge Resort, LLC v. Branch Banking & Trust Co.*, 525 S.W.3d 252, 259 (Tenn. Ct. App. 2016) (quoting *Justice v. Justice*, No. 01-A-01-9312-PB00541, 1995 WL 81414, at *2 (Tenn. Ct. App. Mar. 1, 1995)) (other citations omitted).

The Court will therefore vacate the portion of the previous summary judgment order dismissing Plaintiffs' FITS Claims arising after April 22, 2015. These claims will be reinstated pursuant to this order.

### D. Trade Secret Claims

Previously, the Court held that Plaintiffs' FITS-only trade secrets claims[11] asserted in Count VII (injunctive relief – trade secrets) were barred by res judicata [Doc. 453 at Page ID # 15571]. The Court also held that res judicata applied to the extent Plaintiffs seek monetary damages, costs or fees concerning Defendants' alleged misappropriation of the FITS-only trade secrets in Counts VI and XVI [*id.* at Page ID # 15572]. In light of the dismissal of these FITS-only trade secret claims/requests for relief and because Defendants were no longer producing FITS (and because Plaintiffs offered no proof Defendants planned to use FITS-only trade secrets in the future), the Court held that the declaratory relief Plaintiffs seek in Counts VI (declaratory judgment – trade secrets) and XVI (trade secret misappropriation and unfair competition – Omni Wool Tactical and Hiwassee Trading Company Socks) was moot to the extent it concerned FITS-only trade secrets [*id.*].

Under the Tennessee Uniform Trade Secrets Act ("TUTSA"), "misappropriation" means:

> (A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (i) Used improper means to acquire knowledge of the trade secret; or
>>
>> (ii) At the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was:
>>
>>> (a) Derived from or through a person who had utilized improper means to acquire it;

---

[11] The FITS-only trade secrets are those alleged trade secrets that Plaintiffs do not claims were incorporated into the Omni Wool Tactical or Hiwassee Trading Company socks.

(b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake;

Tenn. Code Ann. § 47-25-1702(2).

It is unclear when the alleged FITS-only trade secret misappropriation took place, but unlike the other FITS Claims (such as trademark infringement based on the sale of unauthorized versions of FITS) which allegedly recurred throughout the pendency of the Chancery Court Case, YEI contends in its motion for revision that "there was no infringement on YEI's trade secrets until over a year and a half after Crescent's filing of the Chancery Court lawsuit." [Doc. 459 at Page ID # 15616]. In light of this representation, the Court finds that the FITS-only trade secret misappropriation claims, including the associated request for damages and injunctive relief, should not have been dismissed on res judicata grounds.[12]

The Court previously held that the declaratory relief Plaintiffs sought for FITS-only trade secrets in Counts VI and XVI (a declaration that YEI is the owner of the trade secrets) was moot. The existence of a trade secret, however, is an element of any misappropriation of trade secrets

---

[12] The Court notes, however, that it is not at all clear from Plaintiffs' third amended complaint [Doc. 201] that the trade secret misappropriation claims only first arose over a year and a half after the filing of the Chancery Court Case. The Court's reinstatement of Plaintiffs' trade secret claims is based on YEI's representation in the instant motion for revision that such claims did not arise until "over a year and a half after Crescent's filing of the Chancery Court lawsuit." [Doc. 459 at Page ID # 15616]. Plaintiffs will be bound by this representation and thus will not be permitted to attempt to seek damages for any FITS-only trade secret claims that arose prior to the time period referenced in the motion.

claim.  *See* Tenn. Code Ann. § 47-25-1702(2) (defining "Misappropriation" as acquisition, disclosure, or use of a "trade secret").  Because the Court will allow YEI to proceed on its FITS-only trade secret misappropriation claims for injunctive relief and for damages, the Court must also necessarily allow Plaintiffs to seek declaratory relief that they are the owners of the FITS-only trade secrets (Counts VI and XVI).  The Court will vacate the portion of its previous summary judgment order dismissing Plaintiffs' FITS-only trade secret claims, and the FITS-only trade secret claims will be reinstated.

The Court also previously held that any relief Defendants seek in their counterclaims concerning the FITS-only trade secrets was either moot or barred by res judicata [*see* Doc. 409 at Page ID # 11495-96; *see also* Doc. 453 at Page ID # 15572].  The Court will vacate that portion of its previous order and will allow these counterclaims to be reinstated.

E.    **Crescent's Alternative Arguments/Issues from Cross Motions for Summary Judgment**

In its response to Plaintiffs' motion for revision, Crescent argues that Plaintiffs' FITS Claims should remain dismissed for the alternative reasons that they are barred by collateral estoppel (issue preclusion), and because the terms of the Business Agreement did not require Crescent to seek or receive Plaintiffs' approval before producing and selling FITS after Yoe was fired [Doc. 463 at Page ID # 15687-90].  Plaintiffs did not respond to these arguments in their reply [*see* Doc. 464].  Defendants raised these or similar arguments in their original motion for summary judgment, and the Court declined to address them at that time, because the Court dismissed all of the FITS Claims on other grounds (primarily res judicata).  The Court also declined

to rule on Plaintiffs'[13] motion for partial summary judgment, which related only to their FITS trademark infringement claims. The Court will address these issues now: first, Defendants' argument that the FITS Claims are barred by collateral estoppel, and second, the parties' respective arguments concerning the Business Agreement/FITS license.

### 1. Collateral Estoppel

Under Tennessee law, collateral estoppel "operates to prevent relitigation of an issue which has been previously determined between the same parties in another suit . . . ." *Mountain Laurel Assur. Co. v. Harber*, No. 07-1105, 2008 WL 4107738, at *3 (W.D. Tenn. Aug. 29, 2008) (quoting *Dickerson v. Godfrey*, 825 S.W.2d 692, 694 (Tenn. 1992)). The party asserting collateral estoppel "has the burden of proving that the issue was, in fact, determined in a prior suit between the same parties and that the issue's determination was necessary to the judgment." *Id.* (quoting *Dickerson*, 825 S.W.2d at 695).

Crescent argues:

> The terms of the Business Agreement, which is the written license for Crescent's use of the FITS mark, were already adjudicated in the state court action. The chancery court found the Business Agreement to be an unambiguous, valid, and enforceable contract. It construed the agreement's terms, which were "definite in scope" and "plain in language," to mean *inter alia* that YEI owned the FITS mark, that Crescent would pay royalties under the schedule set forth in Paragraph 2, that Crescent had no obligations beyond its royalty payments under the license, and that the license was non-exclusive. By its own terms, the Business Agreement was fully integrated and required that any subsequent agreements relating to or modifying it be in writing. On appeal, the Tennessee Court of Appeals affirmed the chancery court's findings and also added that the Business Agreement was the only written contract between YEI

---

[13] The Court notes that the motion is titled "Yoe Enterprises' Motion for Partial Summary Judgment," [Doc. 322]. However, the motion for summary judgment is styled on the docket as having been filed by both YEI and Yoe. The Court previously referred to the motion for summary judgment as having been filed by "Plaintiffs" due to the styling on the docket; the Court will therefore continue to refer to the motion as having been filed by "Plaintiffs," for simplicity's sake.

and Crescent. Thus, the FITS license has already been actually litigated, previously adjudicated, and its interpretation was necessary to the judgment rendered in state court.

[Doc. 463 at Page ID # 15687-88 (citations to the record omitted)].

Crescent overstates what was actually determined in the Chancery Court Case. As relevant here, the chancery court held in its Order Regarding Post Trial Motions:

> The court finds, and noted at the hearing, that the trial of this case was tried over a period of several days, and the movant's attorneys had every opportunity to plead and to argue any issue pertaining to the licensing agreement that they chose to argue. However, they chose not to argue concerning the licensing agreement, and did not request any declaration from this court concerning the various essential terms of the agreement between the parties.

[Doc. 56-1 at Page ID # 628]. Thus, contrary to Crescent's argument, it is clear that the chancery court did not "previously determine" all of the terms of the Business Agreement to the extent it operated as a license agreement. The chancery court did generally hold that all of the written agreements between the parties (including the Business Agreement) were "definite in scope" and "plain in language" [Doc. 24-8 at Page ID # 312], but given the statement from the chancery court quoted above, the chancery court did not address whether there are additional terms to the "license." Nowhere did the chancery court expressly hold, as Crescent contends, that Crescent "had no obligations beyond its royalty payments under the license." [Doc. 463 at Page ID # 15688]. What the chancery court did hold at the pages cited by Crescent is that, under the Business Agreement, YEI owned the socks brands Yoe developed, Crescent was required to pay royalties, and that there "is nothing in the Business Agreement" that required Plaintiffs to reimburse Crescent "for the costs expended in the development, manufacturing and marketing of new brands" or "for any costs incurred or losses." [Doc. 24-8 at Page ID # 302-03]. The chancery court further held

that Crescent did not have an exclusive license to produce FITS after terminating Yoe [Doc. 56-1 at Page ID 631], and finally that:

> Mr. Yoe and YEI have established that the contracts in question in this case are enforceable contracts. The contracts in this case were written agreements executed by the officers and shareholders of Crescent acting in their capacity as members of the Executive Committee of Crescent's Board of Directors. The court finds that there is no question these actions were taken for the purpose of retaining Mr. Yoe's services as a key and/or vital employee. Their actions were supported by valuable consideration: Mr. Yoe's continued employment on the one hand, and increased compensation and benefits from Crescent on the other. The court finds that the terms of the contracts are definite in scope, plain in language and fair to all parties involved. The court specifically finds that there has been no overt or implicit violation of Tennessee's public policy embedded in its provisions, and that there is no proof of fraud on the part of any parties to the contracts.

[Doc. 24-8 at Page ID # 312-13]. When combined with the chancery court's earlier statement about the licensing agreement, it appears the chancery court did not hold that the Business Agreement plainly defined the entire scope of the parties' FITS license. The chancery court left that question open because the parties did not request any declaration concerning the various essential terms of the licensing agreement.

Accordingly, the Court finds that Plaintiffs are not collaterally estopped from arguing the merits of their FITS Claims in Count I (Federal Trademark Infringement – Crescent); Count II (Federal Trademark Infringement – Individual Defendants); Count V (Violation of the Lanham Act, 15 U.S.C. § 1125(a)); Count VIII (Unfair or Deceptive Trade Practices Under Tenn. Code Ann. § 47-18-101, et seq.); Count X (Unfair Competition); and Count XI (Breach of License Agreement). In other words, collateral estoppel is not an appropriate basis for denying YEI's motion for reconsideration, and Defendants are not entitled to summary judgment on these Counts based on collateral estoppel.

### 2. FITS License

The remaining issues go to the heart of the parties' dispute over the FITS Claims.  Plaintiffs argued in their motion for summary judgment that the Court should "enter a judgment against Crescent for infringing the FITS trademark," and Plaintiffs "will address the damages that Crescent's infringement caused" at trial [Doc. 322 at Page ID # 6129].  Plaintiffs' "Federal Trademark Infringement" claims are asserted in Count I of the third amended complaint.  Count I alleges:

> Crescent has exploited the Intellectual Property, more specifically, YEI's federally-registered "FITS®" and "Game Knits®"[14] trademarks, without authorization.  Without authorization or approval by YEI, it has utilized the marks in connection with goods and products which have not been approved by YEI.  Such unauthorized conduct includes, among other things, advertising, selling and marketing socks not manufactured pursuant to YEI's specifications or quality standards with the YEI Trademarks.  In addition, Crescent has used advertising and other materials which display the YEI Trademarks which have not been approved or authorized by YEI.

---

[14] The Court notes that Plaintiffs do not seek summary judgment on any claims relating to Game Knits.  The Court denied Defendants' motion for summary judgment on the Game Knits claims.

[Doc. 201 at Page ID # 2881].[15]

The Court pauses here to note that given the way Plaintiffs argue their motion, it appears they are simply asking the Court to construe YEI's licensing agreement with Crescent; specifically, whether Crescent was permitted to make changes to FITS design and branding after terminating Yoe, without obtaining Yoe's preapproval. Plaintiffs describe the "single, straightforward legal issue at the heart of [the] motion:"

> **Interference with control rights** – Under federal law, a licensee commits trademark infringement if it sells unapproved goods under the licensor's mark. Here, Crescent changed the colors, patterns, design, raw materials, and packaging of YEI's FITS-branded socks without the approval of YEI and refused to allow YEI to supervise or control Crescent's use of the FITS mark. Did Crescent infringe YEI's FITS trademark?

[Doc. 326 at Page ID # 6265]. Plaintiff seek summary judgment that "Crescent infringed YEI's FITS trademark when it seized control over the FITS brand and [made alterations] without YEI's authority or approval between September 2013 and February 28, 2016." [Doc. 326 at Page ID # 6288].

---

[15] In Count II, Plaintiffs allege that Boyd and Allen are jointly and severally liable with Crescent for the infringements, because Boyd and Allen "have personally authorized and/or taken part in the infringing activities of Crescent and/or have specifically directed its employees to do so. The individual Defendants are central figures in the infringements who have authorized and approved the activities of Crescent described herein for their own personal gain." [Doc. 201 at Page ID # 2882]. Plaintiffs do not address Boyd and Allen's role in their motion for summary judgment; therefore, the Court does not address Count II in this order.

It is possible that Plaintiffs intended to seek summary judgment on Count V – Violation of the Lanham Act, 15 U.S.C. § 1125(a), as the Lanham Act does prohibit trademark infringements. However, because Plaintiffs also include allegations of unfair competition in Count V [*id.* at Page ID # 2883], it is not clear they intended to include Count V in their motion for summary judgment. In addition, the Lanham Act is only mentioned once in their 25-page brief filed in support in their motion, and then only in the context of Defendants' now-abandoned laches defense [Doc. 326 at Page ID # 6283]. The Court therefore does not consider whether Plaintiffs are entitled to summary judgment on Count V (Violation of the Lanham Act, 15 U.S.C. § 1125(a)) in this order.

Defendants' position, as mentioned above, is that "[b]ecause the Business Agreement did not include approval or control provisions, Crescent is entitled to summary judgment as a matter of law on YEI's claims for infringement, unfair competition, and breach of license. For the same reason, Allen and Boyd are entitled to summary judgment on YEI's vicarious liability claim." [Doc. 321 at Page ID # 6032]. The claims on which Defendants seek summary judgment on this basis are the FITS Claims in Counts I & II (Federal Trademark Infringement – Crescent, Boyd and Allen), V (Violation of the Lanham Act, 15 U.S.C. § 1125(a)), VIII (Unfair or Deceptive Trade Practices Under Tenn. Code Ann. § 47-18-101, et seq.), X (Unfair Competition), and XI (Breach of License Agreement) [Doc. 321 at Page ID # 6033].

It is undisputed that "a party who holds a valid license to use a trademark and is not in breach of the license cannot be an infringer of the licensed mark." 4 McCarthy on Trademarks and Unfair Competition § 25:30 (5th ed.) (citing *Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008)) (hereafter, "McCarthy"). It is also undisputed that YEI granted a license to Crescent to produce and sell FITS, and that Crescent can be liable for infringement if it failed to operate within the terms of its license. *See, e.g., Masters v. UHS of Del., Inc.*, 631 F.3d 464, 473 (8th Cir. 2011) ("In a typical trademark case, the plaintiff alleges that the defendant's mark . . . is confusingly similar to its own. . . . This case involves a different kind of comparison, i.e., between the use of the mark the licensing agreement grants and UHS's actual use of the mark. . . . [T]he relevant criterion is the degree to which each party remained faithful to the terms of the license agreement." (citations omitted)).

In April 2009, Yoe, Boyd, and Allen signed an amendment to Yoe's existing employment contract. Although this was an amendment to *Yoe's* employment contract (and not an agreement with *YEI*), it discusses YEI's license to Crescent:

> Any and all new brands & related materials: developed, registered, trademarked, copyrighted or otherwise started and or designed by Crescent in years 2009 through [Yoe's] employment:
>
>> will be owned in full and completely by Yoe Enterprises. (At the time of this signing, none of these "new brands" have been trademarked.)
>>
>> YEI will license the "brands" to Crescent for $1.00 a year.
>
> . . . .
>
>> **IF** [Yoe] leaves the company apart from the wishes of Sandra and Cathy without a mutually approved license agreement.
>>
>> **THEN** Crescent has the right to accept or reject a manufacturing/sourcing agreement with terms that would allow them exclusivity to providing socks at 5% Royalty fee. Minimums to be agreed upon at such time. The other conditions would be similar to the LIG contract. Crescent would be responsible for remaining competitive in pricing and quality in order to maintain the agreement.
>
> **. . . .**
>
> Conclusion
> This is meant to be a binding addendum to Bob's employment contract. While reasonable efforts will be made by all parties to have attorneys memorialize the intents of this agreement with appropriate "legalese" – until such time as that is accomplished, the above is our legal and binding agreement when signed by all 3 Executive Committee members: Bob Yoe, Cathy Allen & Sandra Boyd.

[Doc. 326-2 at Page ID # 6344-45].

A later Executive Employment Contract, signed February 15, 2012, states that it supersedes Yoe's prior employment contracts [Doc. 326-9 at Page ID # 6428]. This Executive Employment Contract does not discuss licensing. The Court brings this point up because in Count XI (Breach of License Agreement) of the third amended complaint (on which Defendants seek summary

judgment), Plaintiffs seem to contend that the employment contracts form part of the licensing agreement [Doc. 201 at Page ID # 2890]. It is clear, however, that the February 2012 Executive Employment Contract is the controlling employment contract, and it does not discuss licensing. Moreover, YEI (the owner of the intellectual property) is not a party to any of the employment contracts.

YEI *is* a party to the Business Agreement [Doc. 24-3], which was executed on September 4, 2012, several months after the Executive Employment Contract. The Business Agreement provides, in relevant part:

> WHEREAS, Yoe and Crescent have from time to time entered into certain business agreements relative to branding and intellectual property rights that are not memorialized in the Employment Contract;
>
> WHEREAS, the Parties **desire to memorialize the prior business agreements concerning branding and intellectual property rights in a single agreement**;
>
> NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, . . . the Parties, intending to be legally bound, hereby agree as follows:
>
> 1.     Ownership of Intellectual Property. Any and all new brands, and other intellectual property relating to such new brands, that are developed, registered, trademarked, copyrighted, invented, started, conceived or designed by Crescent, Yoe and/or YEI from January 1, 2009 through the termination of Yoe's employment with Crescent (the "Intellectual Property") shall be 100% owned by YEI. Crescent covenants and agrees that, on or after the date of this Agreement, it shall perform, execute and/or deliver, . . . any and all such further acts and assurances as necessary to effectuate, evidence and consummate the assignment of the Intellectual Property to YEI, including without limitation executing any such documentation as is requested.
>
> 2.     Royalties as to "Fits" and "Jack's" Brands. Crescent shall pay royalties to YEI relative to the "Fits" brand and the "Jack's" brand as follows:

[$1.00 per year for 2013-14; 5% of "Net Sales" for 2015-16 and thereafter].

The term, "Net Sales", means gross sales minus customer deductions, credits issued to customers, returns and bad debts. Royalties shall be paid to YEI on or before 30 days after the end of each calendar quarter.

3. **Licensing. On or before 1 year after the execution of this Agreement, YEI and Crescent will enter into an agreement for licensing/manufacturing/sourcing relative to the Intellectual Property which includes terms and conditions similar to the LIG contract and which incorporates by reference the provisions of Section 2, above.**

4. Miscellaneous.

(a) This Agreement shall be binding upon the Parties and their legal representatives, predecessors, successors and assigns as of the Effective Date notwithstanding the contemplation of a future agreement among the Parties.

(b) The Parties acknowledge that they have had input into the drafting of this Agreement or, alternatively, have had an opportunity to have input into the drafting of this Agreement. Accordingly, in any construction to be made of this Agreement, it shall not be construed for or against any party, but rather shall be given a fair and reasonable interpretation, based on the plain language of the Agreement and the expressed intent of the Parties.

(c) **No change, alteration, amendment or modification to this Agreement shall be valid and enforceable unless stated in writing and duly executed by all Parties. No waiver shall be binding unless executed in writing by the Party making the waiver.**

(d) This Agreement may be executed in two or more counterparts, including without limitation by facsimile or electronic signature, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(e) Each Party represents and warrants that the individual signing this Agreement on behalf of such Party is duly authorized and fully competent to do so.

[*Id.* (emphasis added)].  The language of the Business Agreement indicates the parties intended to reduce all of their *prior* agreements concerning their intellectual property into one agreement.  It is clear that YEI would license FITS to Crescent, and that the parties intended to enter into a more detailed licensing agreement in the future.  Unfortunately, they never did, and Yoe was eventually fired.  Crescent continued to produce FITS after Yoe was fired (as it was required to do by the chancery court injunction), and it is undisputed that Crescent had a license to produce FITS during this time.

On June 10, 2015, YEI notified Crescent that it was terminating the license, and on June 19, YEI notified Crescent that it was rescinding the termination temporarily (thereby temporarily reinstating the license) [Doc. 350-1].  On July 31, 2015, YEI notified Crescent that it would fully reinstate the license, and that "Crescent should continue to comply with the temporary injunction that was entered by the Chancery Court of McMinn County." [*id.* at Page ID # 8506].  Crescent stopped manufacturing FITS on February 28, 2016, when YEI took over production [Doc. 377-6].  Although the Court has located nothing in the massive record showing that YEI formally terminated the license again, there is a letter from counsel for YEI to counsel for Crescent indicating that YEI would take over responsibility for producing and selling FITS beginning February 28, 2016 [Doc. 377-6].

Appealing to general principles of contract law, which undisputedly applies to license agreements, Crescent argues that the Business Agreement is plain and unambiguous, and did not require Crescent to seek YEI's (or Yoe's) approval before making changes to FITS after Yoe was fired [*see, e.g.*, Doc. 321 at Page ID # 6032-36].  In effect, Crescent's argument is that by executing the Business Agreement without including any quality control provisions, YEI gave up the right to control Crescent's use of the FITS mark, other than by YEI terminating the Business Agreement.

Plaintiffs argue that the Court must look beyond the Business Agreement to substantive trademark law and the parties' course of dealings, wherein Yoe himself controlled and oversaw the production, marketing and sales of FITS, to determine what was permitted under the license and whether Crescent breached the license when it sold socks that incorporated changes which YEI did not approve [Doc. 382 at Page ID # 10997-11002]. Crescent responds that the details of the parties' prior course of dealings amount to parol evidence, which should be not be introduced because the Business Agreement is unambiguous. Moreover, Crescent argues, "[a]ny finding of a previously or later-executed, non-written agreement would eschew the Business Agreement's integration clause and prohibition against non-written amendments and modifications." [Doc. 463 at Page ID # 15688]. If YEI did not think the Business Agreement was an acceptable license, Crescent argues, it should have terminated the license or negotiated new terms.

"The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." *Nat'l Healthcare Corp. v. Baker*, No. 3:14-cv-02015, 2016 WL 3232725, at *11 (M.D. Tenn. June 13, 2016) (quoting *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)) (applying Tennessee law). To ascertain the parties' intent, the Court must look to the plain meaning of the words in the document and interpret the contractual language. *Crye-Leike, Inc. v. Carver*, 415 S.W.3d 808, 816 (Tenn. Ct. App. 2011). "Additionally, the court may consider the situation of the parties, the business to which the contract relates, the subject matter of the contract, the circumstances surrounding the transaction, and the construction placed on the contract by the parties carrying out its terms." *Simonton v. Huff*, 60 S.W.3d 820, 825 (Tenn. Ct. App. 2000) (citations omitted). Nevertheless, "[w]hen the language of the contract is plain and unambiguous,

the court must determine the parties' intention from the four corners of [the] contract, interpreting and enforcing it as written." *Id.* (citations and footnote omitted).

"Since courts should not look beyond a written contract when its terms are clear, the parol evidence rule provides that contracting parties cannot use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract." *Schwartz v. Diagnostix Network Alliance, LLC*, No. M2014-00006-COA-R3-CV, 2014 WL 6453676, at *9 (Tenn. Ct. App. Nov. 17, 2014) (quoting *GRW Enters., Inc. v. Davis*, 979 S.W.2d 606, 610-11 (Tenn. Ct. App. 1990)). This is because "allowing a party to introduce evidence of oral statements which contradict the express terms of a written contract defeats the very purpose of committing agreements to writing." *Tidwell v. Morgan Bldg. Sys., Inc.*, 840 S.W.2d 373, 376 (Tenn. Ct. App. 1992) (citation omitted). Regarding the parol evidence rule, the Tennessee Court of Appeals has further explained:

> The rule appears to be quite all-encompassing. However, the courts have been reluctant to apply it mechanically and have now recognized that it has numerous exceptions and limitations. Thus, *the rule does not prevent using extraneous evidence to prove the existence of an agreement made after an earlier written agreement,* or *to prove the existence of an independent or collateral agreement not in conflict with a written contract.* In each of these circumstances, the courts have conceived that the parol evidence is not being used to vary the written contract but rather to prove the existence of another, separate contract.

*Schwartz*, 2014 WL 6453676, at *9 (quoting *GRW Enters., Inc.*, 797 S.W.3d at 610-11) (emphasis in original).

Where, as here, a "term is left open for future negotiation, there is nothing more than an unenforceable agreement to agree." *Cadence Bank, N.A. v. The Alpha Trust*, 473 S.W.3d 756, 774 (Tenn. Ct. App. 2015) (citation omitted). Accordingly, as Crescent points out, the reference to the "LIG contract" in the Business Agreement is not an indication that the parties actually incorporated the terms of that contract into their license.

While the Business Agreement does not contain any terms granting YEI control/approval rights of FITS design and branding, it does not grant Crescent total control over the use of the FITS mark, either. Moreover, the parties had a course of dealing *after* execution of the Business Agreement that could have established some sort of approval/decision-making procedure.[16] And, while the Business Agreement states that it can only be modified in writing, a separate agreement concerning control/approval of FITS design and branding would not actually modify the Business Agreement, because the Business Agreement is silent on this issue. Not only does the Business Agreement not contain design/branding control provisions (or other provisions one might typically find in a trademark license agreement), it expressly recognizes that silence by indicating the parties' intent to enter into a more detailed licensing agreement in the future. Crescent itself acknowledges that parol evidence is admissible to prove the existence of an "independent or collateral agreement . . . made after an earlier written agreement [which is] not in conflict with [the written agreement]." [Doc. 394 at Page ID # 11262 (quoting *Schwartz*, 2014 WL 6453676, at *9)].

The Court therefore agrees with Plaintiffs that the "absence of a written control provision in the Business Agreement does not entitle Crescent to summary judgment on YEI's FITS claims" [Doc. 382 at Page ID # 10997]. The Court will not deny YEI's motion for reconsideration (or grant Defendants' motion for summary judgment) on the remaining FITS Claims based on the lack of a written control/preapproval provision favoring YEI in the Business Agreement.

In support of their motion for summary judgment on their trademark infringement claims (and in opposition to Defendants' arguments for summary dismissal of Plaintiffs' FITS Claims),

---

[16] In their reply brief in support of their motion for summary judgment, Plaintiffs write that their course of conduct regarding FITS "continued up to and beyond the execution of the Business Agreement." [Doc. 395 at Page ID # 11282].

Plaintiffs argue that their right to control FITS arose from the parties' undisputed course of dealings and from substantive trademark law.

In Tennessee, "a contract can be express or implied and either written or oral, but regardless, an enforceable contract 'must result from a meeting of the minds of the parties in mutual assent to terms, must be based upon sufficient consideration, must be free from fraud or undue influence, not against public policy and sufficiently definite to be enforced.'" *Constr. Crane & Tractor, Inc. v. Wirtgen America, Inc.*, No. M2009-01131-COA-R3-CV, 2010 WL 1172224, at *7 (Tenn. Ct. App. Mar. 24, 2010) (quoting *Moody Realty Co., Inc. v. Huestis*, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007)) (other citations omitted). "A contract must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties." *Doe v. HCA Health Servs. Of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) (internal quotation marks and citations omitted). "In a contract implied in fact, the conduct of the parties and the surrounding circumstances show mutual assent to the terms of the contract." *Thompson v. Hensley*, 136 S.W.3d 925, 930 (Tenn. Ct. App. 2003) (citation omitted).

Regarding the parties' course of dealings, Defendants concede that during his tenure as CEO of Crescent, "Mr. Yoe oversaw all of Crescent's business, including its creation, manufacture, marketing and sale of socks under the FITS brand and others. He supervised all Crescent employees, including those employees responsible for manufacturing, marketing, and selling FITS branded socks." [Doc. 377 at Page ID # 10842]. Defendants argue that Yoe was not acting on behalf of YEI at this time because he was an employee of Crescent, but they cite no authority to support their argument that Mr. Yoe's dual role is dispositive. Defendants chose to hire Yoe, the sole owner of YEI, to act as CEO of Crescent. Defendants also chose to allow YEI, Yoe's company, to retain ownership of all intellectual property associated with sock brands Yoe

developed while working for Crescent. YEI acts through Yoe, its sole owner. Certainly Defendants do not point to any document indicating the parties agreed that any action Yoe took with regard to FITS was taken on behalf of Crescent rather than YEI. Indeed, the agreements between the parties seem to indicate that Yoe's creative work with regard to FITS or other socks would benefit both YEI and Crescent.

Plaintiffs contend that Yoe:

> oversaw the development of the unique knitting machine programs required to manufacture the socks. He made decisions about the socks' colors and patterns. He chose what raw materials went into the socks. He approved the design of the socks' packaging. He decided what styles of socks to include in the FITS lineup. In essence, he and the small "FITS Team" working under his supervision made FITS work.

[Doc. 382 at Page ID # 11001-02]. In his affidavit submitted in support of Plaintiffs' motion for summary judgment, Yoe states that, during his time at Crescent, "I or a member of my FITS team under my direct supervision were the only people who could approve the packaging and advertising for FITS." [Doc. 326-4 at Page ID # 6373].

It is unknown whether Yoe delegated any of his decision-making or quality control authority to the "FITS team" who apparently were all employed by Crescent. It does appear that Yoe (as the sole owner of YEI) played a significant role in the design and branding of FITS, and exercised quality control over use of the FITS trademark. Moreover, as discussed exhaustively in this opinion, the parties agreed to entry of an injunction in the Chancery Court Case, which seemingly sought to preserve the status quo of operations about one month prior to Yoe's termination. This injunction required Crescent to use the "proper materials, proper packaging, proper technology for manufacturing FITS®, proper manufacturing processes, and using all of the same specifications required to manufacture FITS® that were in place as of August 15, 2013 and

using all of the same specifications required by the patents held by Yoe Enterprises." [Doc. 24-7 at Page ID # 272-73].

Nevertheless, it is not entirely clear from the parties' course of dealings that they mutually agreed YEI (through Yoe) would have final approval rights over all aspects of FITS; that is, whether every design and marketing choice for FITS had to be made or approved by Yoe before the sock could be sold. Could other Crescent employees veto or insist on certain design choices based on business and market considerations, for example, provided the "special bulbous heel and . . . square toe"[17] features are incorporated? Summary Judgment in favor of Plaintiffs on their infringement claims on this basis is therefore inappropriate.

Plaintiffs also argue in their motion for summary judgment that substantive trademark law grants them the right to control all aspects of the design and branding of FITS. They argue any FITS socks had to be made and sold pursuant to the specifications created by Yoe prior to his firing, and that any FITS socks which did not conform to those specifications constitute an infringement of the FITS trademark. McCarthy on Trademarks, a treatise cited by both parties, states that:

> ***Genuine Goods: The Trademark Owner is in Control***. A trademark carries with it a message that the trademark owner is controlling the nature and quality of the goods or services sold under the mark. Without quality control, this message is false because without control of quality, the goods or services are not truly "genuine." . . . . As has been remarked:
>
>> One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of goods manufactured and sold under the holder's trademark. . . . For this purpose the actual quality of the goods is irrelevant: it is the control of quality that a trademark holder is entitled to maintain.

---

[17] *See* Doc. 201 at Page ID # 2871.

> ***The Trademark Owner Has a Duty to Control.*** Thus, not only does
> the trademark owner have the right to control quality, when it
> licenses, it has the duty to control quality. Judge Posner [has] stated
> that an ex-licensee was a trademark infringer because the trademark
> owner is no longer able to exercise quality control over one with
> whom he longer has a license relationship. . . .

McCarthy, § 18.42. Modern rule of licensing—Licensing with quality control (footnotes and citations omitted).

In *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 240 (2d Cir. 2009), a case relied upon by Plaintiffs, the United States Court of Appeals for the Second Circuit affirmed the trial court's determination that the owner of a fragrance trademark was entitled to a preliminary injunction prohibiting CVS from selling bottles of the fragrance that had the UPC removed. The court found that the UPC "acts as a quality control mechanism which enables [the trademark owner] to protect the reputation of its trademarks by identifying counterfeits and by protecting against defects." *Id.* The court found that, regardless of whether the fragrance bottles with the UPC removed were, in fact, genuine, the trademark owner was still likely to succeed on its infringement claims against CVS, reasoning:

> Where the alleged infringer has interfered with the
> trademark holder's ability to control quality, the trademark holder's
> claim is not defeated because of failure to show that the goods sold
> were defective. *That is because the interference with the trademark
> holder's legitimate steps to control quality unreasonably subjects
> the trademark holder to the risk of injury to the reputation of its
> mark.* "One of the most valuable and important protections afforded
> by the Lanham Act is the right to control the quality of the goods
> manufactured and sold under the holder's trademark." *El Greco
> Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d
> Cir.1986). In attaching its mark to its goods over time, a holder
> assures consumers that the goods conform to the mark holder's
> quality standards.

*Id.* at 243-44 (emphasis added).

In *FURminator, Inc. v. Kirk Weaver Enterprises, Inc.*, 545 F. Supp. 2d 685, 686 (N.D. Ohio 2008), another case cited by Plaintiffs, a trademark holder contracted with a company to destroy a defective batch of pet grooming tools. Rather than destroying the tools, the company sold them to another party, and eventually they ended up in the hands of Weaver Enterprises, which sold the tools to consumers at deeply discounted prices. *Id.* at 687-88. The trademark holder sued Weaver for trademark infringement. Weaver argued that the tools were genuine and that they were an innocent third party purchaser of the tools. *Id.* at 688-89. The court granted summary judgment to the plaintiff, finding that the sales of the defective tools were unauthorized and the tools could not be considered authentic. *Id.* at 690. The court noted that the Lanham Act "affords the trademark holder the right to control the quality of goods manufactured and sold under its trademark. Indeed, . . . the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." *Id.* at 690 (internal quotation marks and citations omitted).

Crescent distinguishes both of these cases by pointing out that the infringers, unlike Crescent, were not licensees of the trademark.

*Robert Trent Jones II, Inc. v. GFSI, Inc.*, 537 F. Supp. 2d 1061 (N.D. Cal. 2008), a case relied on by both parties, involves an alleged infringement by a licensee. The licensor agreed, in a written license agreement, to allow the licensee to sell trademarked products in certain retail stores, but not in "discount stores." *Id.* at 1064. The licensor discovered the licensee was selling its goods at a number of stores which the licensor believed were discount stores, and the licensee admitted its intention to continue selling to one store in particular, The Golf Warehouse ("TGW"). The licensor then filed suit, seeking a preliminary injunction barring the continued sale of its products in TGW. The court noted that, due to the license, the sales were not "inherently

unauthorized," and that the resolution of the suit depended on the proper interpretation of the term "discount store" in the license agreement. *Id.* at 1066. After considering parol evidence, the court found it could not conclude TGW was a "discount store" and denied plaintiff's request for a preliminary injunction. *Id.* at 1067, 1069.

Crescent's use of the FITS trademark was likewise not "inherently unauthorized" because it did have a license. *Robert Trent Jones II* is distinguishable, however, because it involved the court's interpretation of a specific written term of a contract. *See also Lars v. San Siro, Inc.*, No. 96 Civ. 9499 (JFK), 1997 U.S. Dist. LEXIS 9398, at *25 (S.D.N.Y. May 19, 1997) ("Because Mr. Lars specifically reserved the right to make . . . inspections of production samples in order to control the quality of the clothing bearing his Mark, the fact that [d]efendant did not obtain all such approvals prior to distribution and sale renders the unapproved garments for the Spring 1997 line nongenuine." (citations omitted)).

In *Miller v. Glenn Miller Productions, Inc.*, 318 F. Supp. 2d 923, 936 (C.D. Cal. 2004), *aff'd*, 454 F.3d 975 (9th Cir. 2006), a case discussed by both parties, the defendant argued that an alleged license agreement[18] "could not have conveyed a trademark license because the agreement did not contain a provision for the supervision and control over the goods and services GMP [the defendant] produced under the license." The court rejected that argument, reasoning:

> It is well established that when the owner of a trademark licenses the mark to others, he retains a "duty to exercise control and supervision over the licensee's use of the mark." However, a provision recognizing the licensor's supervision and control is not an essential element of a trademark license. *See Dawn Donut Co. v. Hart's Food Stores*, Inc., 267 F.2d 358, 368 (2nd Cir. 1959) ("The absence . . . of an express contract right to inspect and supervise a licensee's operations does not mean that the plaintiff's method of

---

[18] In that case, it was to the defendant's benefit for the agreement to be construed as a "license of Glenn Miller's right to publicity" rather than a trademark license. *Id.* at 934.

licensing failed to comply with the requirements of the Lanham Act. Plaintiff may have in fact exercised control in spite of the absence of any express grant by licensees of the right to inspect and supervise"); *Bunn–O–Matic Corp. v. Bunn Coffee Service, Inc.*, 88 F. Supp. 2d 914 (C.D. Ill. 2000) (holding that an agreement conveyed a trademark license despite the agreement's lack of an explicit quality control provision). *A license agreement need not contain an express quality control provision because trademark law, rather than the contract itself, confers on the licensor the right and obligation to exercise quality control.* Therefore, the lack of a quality control provision in the 1956 agreement does not mean that Helen Miller could not have conveyed a valid trademark license to GMP.

*Id.* at 936-37 (emphasis added; some citations omitted).

In *Trailers International, LLC v. Mastercraft Tools Florida, Inc.*, No. 3:15-cv-00171-BR, 3:15-cv-00767-BR, 2016 WL 4154935 (D. Ore. Aug. 4, 2016), a case cited by Plaintiffs, the trademark owner/licensor granted a license to the defendant/licensee to manufacture and distribute trailers that incorporated trademarked technology. The memorandum of understanding ("MOU") which contained the license did not contain written quality control provisions. *Id.* at *6. In April 2011, the licensor began sending notices of default to the licensee "regarding the [licensee's] alleged failure to abide by specific terms in the MOU and their alleged failure to manufacture trailers to Plaintiffs' standards." *Id.* at *1. In October 2011, the licensor sent the licensee a letter which specifically stated "[t]he use of any and all intellectual properties related to the agreement and UtilityMate brand is hereby revoked as of the date of this letter." *Id.* at *6. The licensee continued to manufacture and sell the trailers, and the licensor sued for trademark infringement relating to the sales after the letter was sent. *Id.* at *2

The court held that the lack of written quality control provisions in the MOU did not foreclose the licensor's claims, reasoning that "the Lanham Act provides a trademark holder with the right to control the quality of goods manufactured and sold under their trademark, to cancel

orders, and to forbid distribution of products that have not been approved by the trademark holder."
*Id.* at *6 (citing *El Greco Leather Prods. Co., Inc. v. Shoe World Inc.*, 806 F.2d 392 (2d Cir. 1986)).
As a result, the court held that the "license agreement need not contain an express quality-control provision because trademark law rather than the contract itself confers on the licensor the right and obligation to exercise quality control." *Id.* (citing *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 992 (9th Cir. 2006)). Ultimately, the court denied the licensor's motion for summary judgment, finding that there was a question of fact regarding "whether Plaintiffs adequately communicated" the quality control standards to the defendants. *Id.* In the *Trailers International* case, the licensor affirmatively instructed the licensee to stop distributing the products once the licensor discovered the quality issues, and sought relief only regarding trailers distributed thereafter. How that fact affected the court's analysis is unclear; however, that fact does distinguish the *Trailers International* case from the case at bar, where the parties agreed to a continuing relationship as defined by the Chancery Court Case injunction.

The language regarding the right of a licensor to exercise quality control in the treatise and cases quoted above is influential. Nevertheless, after carefully considering the issues as presented by the parties, the Court remains unconvinced that general principles of trademark law can impose *specific* quality control or approval provisions between the parties where they were not otherwise bargained for. While a licensor must exercise quality control to avoid abandoning a trademark under the concept of "naked licensing," even Plaintiffs acknowledge "total control is unnecessary." [Doc. 326 at Page ID # 6279]. Yet they ask the Court to read into their license a provision for YEI's total control such that preapproval from Yoe for any change to FITS was required.

At least one court has held that "[t]he fact that a license does not condition use of a mark on the licensor's quality standards does not establish the issue of infringement if the licensee was

in fact granted the right to produce products without the licensor's control." *Sleash, LLC v. One Pet Planet, LLC*, No. 3:14-cv-00863-ST, 2014 WL 3859975, at *14 (D. Ore. Aug. 6, 2014). In *Sleash*, a case not cited by the parties, the trademark owners argued in part that "the principle of 'naked licensing' means that [the licensee's] production of the Sleash Pet Specialty Products that are inconsistent with Sleash's quality standards subjects [the licensee] to liability for trademark infringement." *Id.* at *13. The court found that:

> [T]he mere fact that Sleash has an independent duty to maintain certain quality standards in order to avoid abandoning its mark does not establish trademark infringement. As a result, the resolution of Sleash's trademark infringement argument turns on whether the specific grant clause in the License Agreement conditioned [the licensee's] use of the Slinger® and Sleash® marks on Sleash's "joint" approval pursuant to Section 5.4 [of the license agreement].

*Id.* at *14 (citation omitted). The court ultimately found Sleash was not likely to succeed on the merits of its argument concerning the language of the license agreement, and denied Sleash's motion for a preliminary injunction. *Id.* at *18-20.

The Court again acknowledges that trademark owners, as a general rule, have the right and duty to control the use of their trademarks. Whether and how they exert that right and duty clearly varies from case to case. Plaintiffs ask the Court to find, as a matter of law, that: "Crescent infringed YEI's FITS trademark when it seized control over the FITS brand and altered FITS products' packaging, colors, patterns, and designs without YEI's authority or approval between September 2013 and February 28, 2016." [Doc. 326 at Page ID # 6288]. The Court finds there are questions of fact concerning what changes (if any) Crescent was permitted to make, as well as what changes Crescent actually did make and when. Summary judgment in favor of Plaintiffs on their trademark infringement claims is therefore inappropriate.

To summarize, the Court's holding is that: 1) Plaintiffs' FITS Claims arising after April 22, 2015, are not barred by res judicata and will be reinstated; 2) Plaintiffs' FITS-only trade secret claims should not have been dismissed and will also be reinstated; 3) Defendants are not entitled to summary judgment on Plaintiffs' remaining FITS Claims based on collateral estoppel or the absence of written control/approval provisions in the Business Agreement; and 4) Plaintiffs are not entitled to summary judgment on Count I of their third amended complaint (Federal Trademark Infringement – Crescent).

## IV.    CONCLUSION

For the foregoing reasons, and as set forth herein, Plaintiffs' motion for revision [Doc. 458] is **GRANTED IN PART and DENIED IN PART**.  The Court's previous order on the summary judgment motions [Doc. 453] is **VACATED IN PART** to the extent it dismissed Plaintiffs' FITS Claims arising prior to April 22, 2015, and to the extent it dismissed Plaintiffs' FITS-only trade secret claims and Defendants' FITS-only trade secret counterclaims.

The Court hereby reinstates Plaintiffs' FITS Claims asserted in Counts I, II, V, VIII, X, XI, and XIII of the third amended complaint, to the extent these claims arose after entry of the chancery court's Order Regarding Post Trial Motions on April 22, 2015.  All FITS Claims arising prior to April 22, 2015, remain dismissed pursuant to the Court's November 14, 2017, memorandum and order [Doc. 453].

All FITS-only trade secret claims asserted in Counts VI, VII, and XVI are hereby reinstated.  Defendants' FITS-only trade secret counterclaims are hereby also reinstated.

## V.    SCHEDULING ORDER/STATUS CONFERENCE

At the parties' request, the Court previously set aside the following dates from the amended scheduling order: 1) the deadline for submission of the final pretrial order, 2) the date for the final

pretrial conference, and 3) the trial date [Docs. 215, 456].  With the issuance of this Order, the

Court finds it necessary to order new dates, as follows:

1. ***Special Requests to Instruct for Jury Trial:***

Pursuant to Local Rule 51.1, requests for jury instructions shall be submitted to the Court no later than **June 25, 2018**, and shall be supported by citations of authority pursuant to Local Rule 7.4.  A copy of the prepared jury instructions should be sent as an electronic mail attachment to lee_chambers@tned.uscourts.gov.

The parties shall confer and submit a joint proposal for jury instructions to the extent possible.  Before submitting proposed instructions to the Court, the parties must attempt to resolve any disagreements.  If not submitted jointly, each set of proposed instructions must include a certification that the movant has in good faith conferred or attempted to confer with the other parties in an effort to resolve any disputed instructions.

The Court uses the Sixth Circuit Criminal Pattern Jury Instructions as its model in formulating the final instructions given to the jury; therefore, all proposed instructions must follow their form of the pattern instructions.  The parties shall not submit proposed instructions for matters common to both civil and criminal cases and covered by the pattern instructions unless they seek to depart from t hose standard instructions.

The parties shall also submit no later than **June 25, 2018**, proposed verdict form(s), including any proposed special interrogatories for the jury.

2. ***Final Pretrial Conference:***

(a)  A final pretrial conference will be held in this case on **July 23, 2018, at 2:00 p.m. [EASTERN],** before United States Magistrate Judge Susan K. Lee, 4th Floor Courtroom, U.S. Courthouse, 900 Georgia Avenue, Chattanooga, Tennessee.  All lawyers who plan to participate in the trial must be present in person at the final pretrial conference.  The parties shall prepare and submit a proposed final pretrial order to the Court on or before **June 25, 2018**.  The proposed final pretrial order shall include a chart setting forth any outstanding objections to exhibits and deposition designations, along with responses to the objections and citations to appropriate authority.

(b)  The Clerk may provide counsel with a jury list containing names and personal information concerning prospective petit jurors (hereafter, "the jury list").  Counsel and any other person provided with the jury list may not share the jury list or information therein except as necessary for purposes of jury selection.  Following jury selection, counsel and any other person provided the jury list must return to the Clerk the jury list and any copies made from the jury list or destroy them.

3. ***Trial:***  The Trial of this case will be held before United States Magistrate Judge Susan K. Lee **with a jury** beginning on **August 20, 2018**.  The trial is expected to last **two weeks**.

Counsel shall be present at **8:30 a.m.** to take up any preliminary matters which may require the Court's attention. The parties shall be prepared to commence trial at **9:00 a.m.** on the date which has been assigned. If this case is not heard immediately, it will be held in line until the following day or any time during the week of the scheduled trial date. **SHOULD THE SCHEDULED TRIAL DATE CHANGE FOR ANY REASON, THE OTHER DATES CONTAINED IN THIS ORDER SHALL REMAIN AS SCHEDULED. SHOULD THE PARTIES DESIRE A CHANGE IN ANY OF THE OTHER DATES, THEY SHOULD NOTIFY THE COURT AND SEEK AN ORDER CHANGING THOSE DATES.**

4. ***Status Conference*:**

The Court will conduct a status conference on **May 31, 2018, at 9:30 a.m. [EASTERN]**, 4th Floor Courtroom, U.S. Courthouse, 900 George Avenue, Chattanooga, Tennessee. During the conference, the Court will require the parties to inform the Court of the status of each of the pending motions, including whether any agreed resolutions have been (or are likely to be) made to narrow the issues presented or resolve the motion in its entirety. This includes:

1. Crescent's motion in limine ("MIL") to exclude opinions of D. Michael Costello[19] [Doc. 309];

2. Crescent's MIL to exclude the opinions of Stuart Seltzer[20] [Doc. 313];

3. Crescent's MIL to exclude the opinions of Pete Canalichio [Doc. 317];

4. Plaintiffs' MIL to exclude testimony of Thomas Lee [Doc. 328];

5. YEI's motion to strike expert testimony of Esther Roberts [Doc. 329];

6. Crescent's MIL to exclude opinions of Mitchell Beckler[21] [Doc. 334];

7. Crescent's MIL to exclude opinions of Oscar Nardi [Doc. 337];

---

[19] Crescent should address this motion in light of the Court's order at Docket No. 366, as well as the Court's rejection in the summary judgment order of Defendants' argument concerning Mr. Costello's method of calculating damages and discussion of *Hamilton-Ryker Group, LLC v. Keymon*, No. W2008-00936-COA-R3-CV, 2010 WL 323057 (Tenn. Ct. App. Jan. 28, 2010) (discussing TUTSA) [*see* Doc. 453 at Page ID #15583-85].

[20] Both parties should be prepared to address the relevance of the testimony of their respective licensing experts in light of the Court's holding in this Order.

[21] Both parties should be prepared to address the standards that apply and whether Mr. Beckler is a witness specially employed or retained.

8. Crescent's motion to strike supplements to expert reports and rebuttal reports of Stuart Seltzer and Pete Canalichio [Doc. 343];

9. Plaintiffs' motion to strike Defendants' supplemental disclosure of Bill Reveal [Doc. 396];

10. Crescent's first MIL to preclude testimony and argument about irrelevant issues from state court case [Doc. 411];

11. Crescent's second MIL to preclude reference to discovery disputes [Doc. 413];

12. Crescent's third MIL to preclude use of the term "trade secret" by YEI's experts [Doc. 415];

13. Plaintiffs' MIL concerning Yoe's salary, issues litigated in the Chancery Court Case, and the parties' post-appeal settlement agreement in the Chancery Court Case [Doc. 417];

14. Plaintiffs' MIL to prohibit and exclude testimony of Erich Joachimsthaler Relating to Licensing [Doc. 418]; and

15. Plaintiffs' motion for permission to submit confidential documents [Doc. 419].

In addition, the Court previously entered a memorandum and order [Doc. 452] concerning Crescent's motion for sanctions pursuant to Federal Rule of Civil Procedure 37(e) for alleged spoliation of electronically stored information [Docs. 288 & 289]. The Court's order states:

> Defendants mainly seek a ruling preventing or limiting YEI's attempt to recoup any of its alleged $2 million in costs for recreating the FITS sock-related technology. Given the Court's contemporaneous ruling on the summary judgment motions, it is not clear to the Court how any such costs could be recovered in the claims that remain pending in this action, but the Court has insufficient information at this time and the parties have not been able to consider the summary judgment ruling yet. If Plaintiffs intend to attempt to pursue such costs given the Court's grant of partial summary judgment to Crescent in this action, the Court will hear from the parties at the final pretrial conference as to what, if any, non-monetary remedial measures are proper in light of this Order.
>
> The Court will **RESERVE** ruling on the imposition of any monetary remedial measures until any post-trial motions are

> addressed so that the parties may be fully heard at an evidentiary
> hearing regarding the propriety and extent of any such measures
> without distracting either the Court from addressing the numerous
> motions recently filed or the parties' trial preparations.

[Doc. 452 at Page ID #15543].

At the status conference, the Court will also hear from the parties on the remaining issues regarding spoliation sanctions. Specifically, the Court will hear from the parties regarding the legal basis for the $2 million damages request for the out-of-pocket expenses Plaintiffs allegedly incurred in having to recreate the FITS programs, how the spoliation order impacts Crescent's second motion in limine to preclude reference to discovery disputes [Doc. 413], and possible remedial measures for the spoliation [*see* Doc. 452].

In addition, the Court previously reserved ruling on any trade secret misappropriation claim relating to the three socks knitted on a 108-needle machine and the one sock knitted on an 84-needle machine [Doc. 453 at Page ID # 15582-83]. Defendants argued in their summary judgment motion that both of Plaintiffs' technical experts admitted Plaintiffs have no evidence that the alleged trade secrets were used to make these four types of socks [Doc. 325 at Page ID # 6187-88]. The Court noted that Plaintiffs' witness Mitchell Beckler testified his report did not contain an opinion that trade secret numbers 1, 2, 3, 6 and 21 were used in these four types of socks, but that his testimony was less clear regarding whether trade secret numbers 13, 14, and 16 were incorporated [Doc. 453 at Page ID # 15582]. The Court further noted that Plaintiffs' witness Oscar Nardi's testimony regarding whether the trade secrets were incorporated into these socks was even less clear than Beckler's [*id.* at Page ID # 15582-83]. If the parties have not otherwise resolved this issue prior to the status conference, Plaintiffs should be prepared to point out the record evidence concerning whether any trade secrets were incorporated into these four socks and the specific portions of the expert's reports addressing each sock and trade secret.

Finally, the parties must discuss bifurcation and/or trifurcation of the trial prior to the conference and come prepared to present their position(s) regarding same.

SO ORDERED.

ENTER:

s/ *Susan K. Lee*

SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE